**In the Matter of LANDMARK AT PLAZA PARK, LTD., a Limited Partnership of the State of Pennsylvania.**

**Bankruptcy No. 80–00834.**

United States Bankruptcy Court, D. New Jersey.

Dec. 5, 1980.

Kleinberg, Moroney, Masterson & Schachter by Sheldon Schachter, Millburn, N. J., for debtor.

McCarter & English, Newark, N. J. by Hayden Smith, Jr., Newark, N. J., for City Federal Sav. & Loan Ass'n.

## OPINION RE: CONFIRMATION OF PLAN

RICHARD W. HILL, Bankruptcy Judge.

This opinion constitutes the Court's findings of fact and conclusions of law with respect to a Chapter 11 confirmation hearing held on debtor's plan of reorganization, as modified.[1] The opinion explains the November 3, 1980, letter decision of the Court.

Debtor, Landmark at Plaza Park, Ltd., is a limited partnership whose only substantial asset is a 200–unit garden apartment complex located in Morrisville, Pennsylvania. City Federal (hereafter City) holds a first mortgage on this property in the face amount of $2,250,000. The mortgage bears an interest rate of 9.5% and is due and payable on October 1, 1986. On October 2, 1980, this Court issued a written decision denying City's request for relief from the automatic stay provisions of Section 362 of the Bankruptcy Code, 11 *U.S.C.* Section 362, and continuing the stay until the conclusion of the hearing on confirmation of the debtor's plan. This opinion deals with debtor's plan as it affects City, the only objecting class of creditors. As to all other classes of creditors, there is no dispute and the Court is satisfied that the confirmation standards specified in 11 *U.S.C.* Section 1129 have been met.

Before discussing the merits of debtor's plan three things should be noted. First, the parties have stipulated that the record from the Section 362 hearing is part of the record herein.[2] Second, the parties have stipulated that for the purpose of the confirmation hearing $2,260,000 is the fair market value of the property. This value was fixed by the Court after lengthy testimony was presented at the Section 362 hearing. And third, City has made an election pursuant to Section 1111(b)(2) of the Code. Thus,

---

1. A plan of reorganization was filed on June 13, 1980. A disclosure statement was approved on August 4, 1980. A modification of the plan was filed on October 22, 1980, during the course of the confirmation hearing. The confirmation hearing was concluded on October 22, 1980.

2. The Court's written opinion in conjunction with the Section 362 trial provides background material for this decision which is not repeated herein.

its claim in the amount of $2,512,457 will be treated as fully secured.[3]

## I. THE PLAN AS MODIFIED

Crucial to an understanding of the Court's decision is a discussion of the plan and how it affects City. Contractually, City is a first mortgagee without recourse. It has possession of the property and is collecting the rents pursuant to a rent assignment agreement. The mortgage has been in default since at least December, 1979. City is undersecured and wants to complete its foreclosure action.

The debtor has proposed in substance the following plan:

1. City is to redeliver possession of the property to the debtor.
2. On the 16th month after the effective date of the plan and through the 36th month debtor will commence monthly interest payments at the rate of 12.5% computed on the value of the property–$2,260,000.
3. Debtor will deliver to City a non–recourse note, payable in three years in the face amount of $2,705,820.31, in substitution of all existing liabilities.
4. The existing mortgage will secure the note set forth in paragraph 3, except to the extent that it is inconsistent with or modified by the plan.
5. City is the only member of the class of creditors to which it has been assigned.

The face amount of the note is derived as follows:

| | | |
|---|---|---|
| a. | Current value of collateral | $2,260,000.00 |
| b. | Unpaid interest: months 1–15 @ 12.5% | 353,125.00 |
| c. | Interest on unpaid interest: 21 months @ 15% | 92,695.31 |
| | Face amount of note | $2,705,820.31 |

The debtor's principal theory is that the note will be paid off at the end of 36 months by a combination of refinancing and accumulation of cash from the project, all of which will subsequently be discussed at length. The key to the debtor's plan is a proposal to obtain a new first mortgage in three years in the face amount of $2,400,-000.

It is undisputed that pursuant to this plan City is impaired within the meaning of Section 1124 of the Code. City has rejected the plan.

## II. THE ISSUES

Confirmation standards under the Code are set forth in Section 1129. Clearly, the debtor has complied with all provisions of that section except for the following subsections: (a)(7)(B); (a)(8); (a)(11); (b)(1); and (b)(2)(A). Actually the list is much shorter. The requirements of (a)(7)(B) are, in effect, carried forward in (b)(1) and (b)(2). Thus if the requirement of subsections (b)(1) and (b)(2) are met (a)(7)(B) will also have been met. Similarly, the requirements of (a)(8) are waived by the specific language of (b)(1) if other requirements of (b)(1) and (b)(2) are met. That leaves at issue the debtor's compliance with subsec-

---

**3.** Section 506(a) of the Code provides in part that:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any

hearing on such disposition or use or on a plan affecting such creditor's interest. 11 *U.S.C.* Section 506.

Reading this section alone, City would have a secured claim for $2,260,000 and an unsecured claim for $252,457. Section 1111(b)(2), however, provides that, notwithstanding Section 506(a), a creditor in the position of City may elect to be treated as fully secured. Since City has made the election, for purposes of this hearing its claim of $2,512,457 is fully secured.

There is a slight dispute between City and the debtor as to the amount of the claim. Debtor asserted that the debt was $2,476,449.17 as of November 1, 1980. The difference, however, is immaterial to the outcome of the case.

tions (a)(11), (b)(1) and (b)(2). Subsection (a)(11) of Section 1129 is the feasibility requirement and, in a general sense, deals with whether the debtor can and will accomplish what it has proposed. Subsection (b) of Section 1129 is the "cram–down" provision of the Code. It describes those circumstances in which a class of creditors or interests may over its objection be involuntarily subjected to the provisions of a plan. Each of these sections will be discussed at length. The provisions of subsection (b) will be discussed first because certain determinations made there bear on the feasibility determination required by subsection (a)(11).

## III. THE REQUIREMENTS OF SECTION 1129(b)(1) AND (2)

■ The provisions of Section 1129(b) specify the circumstances under which a class of creditors or interests may be involuntarily subjected to a plan of reorganization. This "cram–down" provision of the Code provides in part that:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides–

(i)(I) that the holders of such claims retain the lien securing such claims, whether the property subject to such lien is retained by the debtor or trans-ferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.[4] 11 *U.S.C.* Section 1129(b).

The concept that a plan is fair and equitable is not fully defined in the Code. Section 1129(b)(2)(A), (B) & (C) states several factors which are included in that requirement but the legislative history accompanying that section makes clear that other factors fundamental to fair and equitable treatment of a dissenting class were omitted to "avoid complexity." Klee, "*All You Ever Wanted To Know About Cram Down Under the New Bankruptcy Code,*" 53 *Amer.Bank.L.J.* 133, 142 (1979); 124 *Cong. Rec. H* 11,103 (daily ed. Sept. 28, 1978) (remarks of Rep. Don Edwards); 124 *Cong. Rec. S* 17,420 (daily ed. Oct. 6, 1978) (remarks of Sen. De Concini). Given the present posture of this case the Court is satisfied that the factors set forth in Section 1129(b)(2)(A)(i), dealing with the cram down of a secured creditor, adequately deal with the question of whether the plan, as to City, is fair and equitable, and the Court will limit its consideration to those factors.

To meet the requirements of Section 1129(b)(2)(A)(i) the debtor's plan must do three things. First, it must provide for retention by the creditor of its lien. Second, the total stream of deferred cash payments proposed by the plan must at least total the amount of the secured claim. Third, the total stream of payments must have a value equal to the value of the property. The plan before the Court satisfies the first two requirements, but may not satisfy the third.[5]

4. Section 1129(b)(2) is divided into three subparts: Subpart (A) deals with classes of secured claims; Subpart (B) deals with classes of unsecured claims; and Subpart (C) deals with classes of interests. Only Subpart (A) is relevant to this decision.

5. For purposes of this opinion the allowed

The third requirement is found in that portion of Section 1129(b)(2)(A)(i)(II) stating that "each holder of a claim . . . receive . . . deferred cash payments . . . of a value . . . of at least the value of such holder's interest in the estate's interest in such property." This provision requires the Court to determine the present value of the payments to be made under the plan. Here the total stream of payments under the plan is $3,200,195.17.[6] The discounted value of these payments must equal $2,260,000, the value of the value of the property.

The debtor's construct for meeting subsection (b)(2)(A)(i)(II) is simple. It assumes that the value of the property constitutes the principal amount of a loan and purports to repay to City that principal amount together with interest at 12.5% per annum.[7] Thus, the debtor argues that if the interest rate fixed is adequate the discounted value of the principal plus interest must equal the present value of the property. To support the fixing of a 12.5% interest rate debtor presented evidence that at the time of the confirmation hearing certain institutional investors would provide first mortgage loans on similar property at that rate. The testimony also revealed, however, that 12.5% is at the low end of the interest range.

City strongly rejects the present value approach asserted by the debtor. It focuses on the question of whether the stream of payments offered by the debtor could be sold as of the effective date of the plan for a price at least equal to $2,260,000. City presented expert testimony that attempted to establish two facts: (1) that even assuming that the property was in good condition and under capable management, the only market for debtor's proposed payment stream would be the secondary mortgage market with the purchase price being 50 to 60 percent of the value of the collateral. It is City's contention that regardless of the

interest rate offered the value of the payment stream will be less than the value of the property; (2) that with income producing property, a non–recourse note in excess of the value of the property would always be worth less than the value of the property because an investor would always prefer the property to the note. City's expert grudgingly conceded that his opinion of the value of the note would change if he had confidence in management and believed that future income projections would in fact be sufficient to pay off the note. The expert, however, then backtracked and concluded that mortgage loans could not be made in reliance on future income projections.

In the Court's view, City's expert so overstated his position that his opinion on saleability and value cannot be considered. Succinctly stated, the Court is satisfied that a non–recourse note in excess of the value of the property can be worth at least the value of the property if sufficient interest is paid on the note and repayment is sufficiently certain. The question in the present case becomes whether the 12.5% interest rate offered by the debtor is adequate and whether repayment is sufficiently certain.

Conceptually, the modified plan seeks to force City to make a $2,260,000 loan, repayable in three years, with the first 15 months of interest deferred. There is no amortization over the term of the loan. Since there is currently no equity in the property the debtor is asking City to make a 100% loan. The rate of interest on a loan of this type should correspond to the rate of interest which would be charged or obtained by a creditor making a loan to a third party with similar terms, duration, collateral and risk. 5 *Collier on Bankruptcy* at para. 1129.03 (15th ed. 1980). Although the rate of interest may be identical to the market rate of interest, this will often not be the case

---

amount of the secured claim is $2,512,457. The total stream of payments is $3,200,195.17 consisting of the face amount of the note, $2,705,-820.31, plus 21 months interest totaling $494,-374.86. Requirement (2) is thus satisfied.

6. *See* footnote 5, *supra.*

7. The plan is somewhat oversimplified by this statement because 15 months interest is deferred and the deferred interest itself bears interest at a 15% rate.

because of the particular risk involved.[8] 5 *Collier, supra* at para. 1129.03.

It appears clear to the Court that the forced loan proposed by the debtor includes terms less favorable to City than would typically be found in the market and that any confirmable plan must compensate City for this deficiency.[9] Testimony presented at the confirmation hearing revealed that institutions such as thrifts, life insurance companies and pension funds would make first mortgage loans on garden apartments with an interest rate ranging from 12.5 to 14 percent.[10] The typical first mortgage loan would have a term of three to ten years, with amortization calculated on a 25 year payout and a 75% maximum loan to value ratio. Secondary mortgage financing would be available for additional borrowing requirements at five points over the prime rate (which was 14% at the time of the confirmation hearing). For interest rate purposes, therefore, it appears appropriate to treat City as the forced holder of two mortgages: a first mortgage to the extent of 75% of the loan and a second mortgage to the extent of 25% of the loan. The Court believes that the first 75% of the loan should bear an interest rate between 13.5% and 14%, the high end of the range for a typical garden apartment loan. Although the three year term is consistent with that in the marketplace, the deferral of interest and the lack of amortization requires a higher interest rate. The remaining 25% of the loan should bear an interest rate at least consistent with that charged in the commercial secondary mortgage market. Testimony at trial indicated that interest on such mortgages is generally five points over prime. With the prime rate approximately 14% at the time of confirmation, the Court believes that 19% is the miminum interest rate on this portion of the loan.[11] A composite loan rate of 15% is then arrived at, computed as follows:

$$.75 (.135) = .1013$$
$$.25 (.19) = .0475$$
$$.1488$$

$$.75 (.14) = .1050$$
$$.25 (.19) = .0475$$
$$.1525$$

Say 15%

Thus, if a note and interest payments were offered to City by debtor at a 15% rate debtor would appear to meet the requirement that the discounted stream of payments equal the value of the property. Because the 12.5% rate proposed by debtor is below the 15% minimum rate established by the Court the plan as presented does not comply with Section 1129(b)(2)(A)(i)(II) and, therefore, cannot be confirmed. Since the plan could be readily modified, however, the Court must determine whether the plan is feasible if funded at a 15% rate. The plan cost at 15% is set forth in Exhibit 1 attached hereto.

## IV. THE REQUIREMENTS OF SECTION 1129(a)(11)

Debtors seeking to confirm plans under Chapters 10, 11 and 12 of the 1898

---

8. Although risk is a factor in determining rates of interest, its importance must not be overstated. We must assume when fixing an interest rate that the plan will be confirmed. If risk of repayment is too great the plan will not be confirmed because the debtor has not met the requirements of Section 1129(a)(11). The question of an interest rate would therefore become irrelevant.

9. In addressing the interest problem a deficiency in the proofs must be noted. The debtor has asserted that a 12.5% rate should be applied. City in effect asserted that regardless of the rate the plan could not be confirmed. The Court has rejected the debtor's rate, but for the purpose of testing the feasibility of the plan has derived a rate. It is not altogether clear that the rate derived by the Court would have been the rate found by the Court if City had presented evidence on the issue.

10. Debtor's expert utilized a 12.5 to 13 percent range. City's expert testified that current rates for traditional mortgage loans were in the 13.5 to 14 percent range.

11. Five points over prime is, of course, a floating rate. Since the Court cannot predict where prime will be during the next three years, for the purpose of testing feasibility it has utilized a fixed rate of 19 percent based on the prime in existence at the time of the confirmation hearing.

Bankruptcy Act, as amended, were required to demonstrate that the plan was feasible. 11 *U.S.C.* Sections 221(2), 366(2), 472(2); *see* 9 *Collier on Bankruptcy*, para. 9.18, 9.18 n.2 (14th ed. 1978). Section 1129(a)(11) of the Code, which for the most part incorporates the policy of the Act, requires the Court to scrutinize the plan proposed by a debtor to determine whether it offers a reasonable prospect of success and whether it is workable. Specifically Section 1129(a)(11) requires the Court to find that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. 11 *U.S.C.* Section 1129(a)(11).

*Collier* states that the purpose of Section 1129(a)(11) is to prevent confirmation of visionary schemes that promise creditors and equity security holders more under a proposed plan than the debtor could possibly attain after confirmation. 5 *Collier on Bankruptcy*, para. 1129.02 (15th ed. 1980). Thus, if the facts indicate that the plan will ultimately lead to liquidation, it is not feasible and cannot be confirmed even if the debtor is sincere and has made a best effort to perform according to the terms of the plan. 5 *Collier, supra* at para. 1129.02. The factors courts should generally consider in making the above determination are (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. 5 *Collier, supra* at para. 1129.02.

■ In the instant case feasibility depends on debtor being able to pay off in three years a note to City in the amount of $2,794,984.38 and pay to City interest of $28,250 per month for 21 consecutive months beginning in the 16th month. The cornerstone of debtor's scheme is to refi- nance the project in three years with a new first mortgage in the amount of $2,400,000. The balance of the needed cash, an additional $394,984.38, would come from secondary mortgage financing, cash accumulated from the project over the next three years, and equity contributions of some $60,000. The key to debtor's goals is the net income that the project will generate, for it is the amount of the net income that will determine the size of the first and second mortgages that will be obtainable and the amount of cash available from the project to apply to the note at the end of three years. The net income will also determine whether debtor can pay its debt service beginning in the 16th month. Finally, the amount of net income will determine debtor's financial ability to cure certain deferred maintenance items, a step necessary to attract and retain tenants and to secure financing. The debtor and City have serious disputes as to all these matters.

## A. DEFERRED MAINTENANCE

The parties are in agreement that substantial deferred maintenance on the premises must be cured. Debtor contends that $240,000 is the amount necessary to perform the needed maintenance, but City argues that $275,000 is a more realistic figure.[12] City also asserts that the domestic hot water piping may have to be replaced at a cost of $66,000. While the Court is not convinced that the entire piping system needs replacement, it is satisfied that extensive repair may be needed.

After reviewing the figures submitted by both parties, and considering the credibility of all witnesses, the Court has prepared a list of repairs that must be accomplished, the cost of which totals $213,000. That list is annexed hereto as Exhibit 2. To this amount the Court had added a $50,000 contingency factor, spread over three years, to cover unanticipated problems and repairs to underground electric and water supply systems. Debtor concedes that to attract new tenants and obtain refinancing the project

---

12. This was a stipulated figure for purposes of the hearing under Section 362 of the Code.

must be in excellent condition. The Court agrees. The Court's total figure of $263,000 represents its best judgment as to the minimum that will be needed to meet that goal.

## B. INCOME FROM THE PROJECT FOR THE NEXT THREE YEARS

The heading of this subsection is actually a misnomer. A successful plan depends on the net income from the project which is a function of both the gross income from the project and the project's expenses. Both parties have presented to the Court conflicting projections as to income and expense. Since the Court must assume that the debtor will continue to operate this project, the feasibility of the plan must be examined in light of debtor's cash flow projections. These projections, however, are not conclusive. After analyzing the documentary evidence and the testimony of the witnesses the Court has reached its own projections as to income and expense which are annexed hereto as Exhibits 3 (Income) and 4 (Expense). A comparison between the Court's first year figures and those submitted by the debtor and City are attached hereto as Exhibit 5.

In analyzing the income and expenses of the project for the ensuing three years the Court notes that it is not dealing with a fully rented, well maintained property. Instead, the Court's analysis must start with a 200–unit garden apartment project that had more than 50 vacancies in December, 1979, was in a serious state of disrepair, and had a lower income tenant population which to a large degree lacked interest in maintaining the project in good condition. As of October, 1980, the vacancy rate had been reduced to 20 apartments, but substantial deferred maintenance was still required and the tenant population remained unchanged. In view of these facts the parties have made different assumptions concerning the project's income. These differences concern: (1) the propriety of imposing a rent increase during the first year of the plan;

and (2) the appropriate vacancy and credit loss factor.

Debtor claims that it will impose a rent increase during the first year of the plan. The Court's calculations, as set forth on Exhibit 3, reflect a rejection of this assumption because it is convinced that a rent increase coupled with the present condition of the property would adversely affect the vacancy factor. Accordingly, the Court has utilized the first year gross income figures prepared by City's managing agent, Tabb Associates, and set forth on C–2 in evidence.

The question of an appropriate vacancy [13] and credit loss factor was also the cause of significant dispute between the parties. Tabb utilized a 9% rate. Debtor utilized a 4.5% rate. At the Section 362 hearing City's appraiser used a 3% rate and debtor's expert employed a 5% rate. In determining how to handle this situation there are two facts over which there is no disagreement. As of October, 1980, there were 20 vacant apartments. These will not be rented instantly. All parties agree that the current clientele at the apartments is undesirable. As set forth on Exhibit 3 the Court has gradually reduced the vacancy and credit loss factors to 5% during the third year. Rent increases have been built in during the second and third years utilizing a 7% factor which approximates the rates built in by both parties.

With respect to expenses, although both parties have in substance agreed on many items there are three major areas of disagreement. The first involves the amount to be expended on fuel oil. The second involves the amount to be spent on maintenance. The third involves the management fee that will be charged.

The oil issue is difficult because it involves a projection of oil prices and a projection of oil consumption. The Court finds debtor's projections of oil price as credible as can be expected–$1.00 per gallon the first year with 15% increases in each of

---

**13.** The Court accepts debtor's assumption that two apartment units will be dedicated for management use. This item is solely within the debtor's control so there is no reason to accept Tabb's opinion on this issue.

the two succeeding years.[14] The consumption issue presents a more difficult problem with at least three variables: (1) weather; (2) occupancy level; and (3) the impact of installation of energy saving devices. Debtor predicts substantial energy savings through the use of increased insulation, flue dampers, and other devices. Debtor starts with an historical consumption figure of 95,000 gallons and reduces that to 61,807 gallons to take into account energy saving measures. This results in a base cost of $61,807. Tabb, on the other hand, starts with a consumption figure of 105,000 gallons, an amount obtained from a fuel dealer, and reduces that figure by 22% to take account of energy saving devices. That figure was then increased to account for projected occupancy increases. A base gallonage of 92,660 was derived to which a price of $1.03 per gallon was applied resulting in a base cost of $95,439.80. That figure was then adjusted upwards by $2,350 to account for Tabb's opinion that last year was a "mild winter."[15] The Court is satisfied that historical usage has been in the 95,000 to 100,000 gallon range and is further satisfied that the historical figure must be adjusted upward to account for increased occupancy but downward to account for the installation of energy saving devices for the first year. The Court has utilized an annual consumption figure of 81,000 gallons at $1.00 per gallon. This represents a net usage reduction of 15% utilizing a basic figure of 95,000 gallons and adjusting that figure for energy savings and increased occupancy.[16] As with all other expense items, second and third year cost figures are adjusted for inflation.

Because debtor and City utilized different categories in discussing the proper allowance for maintenance and payroll it is difficult to precisely compare what each party proposes. It is the Court's judgment, however, that debtor's figures are skimpy and insufficient to maintain the project in an excellent condition—the required standard for tenant attraction and refinancing. From an historical perspective debtor has allowed the project to deteriorate and has been either financially unable or unwilling to maintain the property and buildings at a high level. When one considers this factor, along with the nature of the tenant population, one can only doubt the adequacy of debtor's projections in the present proceeding. Thus, the Court finds Tabb's figures more credible, although the Court has reduced those figures to some extent.

With respect to the management fee the debtor utilized a figure of 4% while City estimated the fee to be 6%. The Court has accepted the debtor's figure. The general partners of debtor control the management company that would provide management services. Since this analysis assumes that the debtor is in control of the project it is safe and appropriate to use the debtor's figures.

It is clear, then, that debtor's projections of income and expense are not realistic. In response to this conclusion the Court has formulated its own judgment as to what income and expenses should properly be over a three—year period. See Exhibits 3 and 4. Given these figures and the 15% interest factor previously derived the final question for the Court is whether debtor can realistically carry out its plan, as required by 1129(a)(11).

## C. FULFILLMENT OF THE PLAN

As stated earlier, fulfillment of the plan contemplates the ability of the debtor to cure certain deferred maintenance items, to make certain interest payments to City, and to pay off a note to City in three years. All of this requires substantial amounts of cash, which is potentially available from the fol-

---

14. Current prices are 90.9 cents per gallon. Both parties agree on the 15% per year increase.

15. This total of $97,789.80 differs slightly from the oil figure of $97,890 shown by City on C–2 in evidence.

16. The Court finds City's energy savings percentages more credible than debtor's figures.

lowing sources: (1) income from the project itself; (2) primary and secondary mortgage financing; (3) sale of the project; and (4) capital contributions. As noted at the outset of this opinion debtor's primary option is to remortgage the project for $2,400,000 at the end of the three–year period. The Court is convinced that the plan cannot be fulfilled.

The best starting point to illustrate the debtor's difficulty is through reference to Exhibit 6 entitled "Three–Year Recap." This exhibit is divided into two sections: "I. Income and Expense" and "II. Refinancing." Each section, in turn, has two subsections: "A. Best Judgment" and "B. Assume 10% Income Increase." Section I, "Best Judgment" is essentially a recap of the income and expense figures set forth in Exhibits 3 and 4. Deducted from the net income figures are the cure costs as determined by the Court in Exhibit 2 and the debt service to City based upon a 15% interest rate all of which is detailed in Exhibit 1. These figures represent the Court's best judgment as to what income and expenses will actually be over three years. The figures in Section I under the subheading "Assume 10% Income Increase" are arbitrary figures, more beneficial to the debtor, utilized by the Court to evaluate its judgment that the plan not be confirmed. The gross income figure for each year of the plan has been adjusted upwards by 10% with the effect of increasing in each year the net income. Although the increase is applied on the gross income side, it is a test figure that can represent an increase in income, a reduction in expenses, or a combination of both. Section II of Exibit 6 examines the feasibility of refinancing the project. It *assumes* that the debtor is able to obtain a $2,400,000 mortgage in three years and depicts the cash shortfall to the debtor under two circumstances: (A) the Court's best judgment figures; and (B) application of the 10% arbitrary increase previously explained. The plan will thus be evaluated both on a best judgment basis and on the basis of assuming a 10% income increase.

Analyzing the Court's "best judgment" figures on Exhibit 6, it is absolutely clear that debtor cannot fulfill its plan. First, the project itself cannot support the periodic interest payments required to be paid to City and, in fact, results in a three year cash deficit of $59,179.87. Second, it is clear that the project cannot support a $2,400,000 refinancing. The testimony is quite clear that when making mortgage loans on garden apartments lenders apply a "coverage factor." The "coverage factor" is the relationship between income of a project prior to debt service and the debt service. For example, if the income from a project prior to debt service were $100,000 and debt service was $80,000 the coverage factor would be 1.25. If debt service were $75,000 the coverage factor would be 1.33. The testimony supports a conclusion that the prevailing coverage factor on garden apartment loans is in the range of 1.25 to 1.33.

In the Court's judgment, the net income of this project after three years will be $292,570.20, *see* Exhibit 6. Utilizing a coverage factor in the 1.25 to 1.33 range would justify debt service maximums of $234,056.16 and $219,977.59, respectively. The debt service on a $2,400,000 mortgage would vary with a particular interest rate, *see* Schedule 11 on Exhibit L–2 in evidence, but even at a 10.5% rate, the low range of the scale, the annual debt service of $272,160 substantially exceeds what would be available from income. With first mortgage financing unavailable to debtor, it is unnecessary to consider the possibility of second mortgage financing. Even debtor's proposed equity infusion of $60,000 by debtor's limited partners would be of little help.

Debtor's alternative suggestion, also unconvincing, is that the property could be sold to satisfy the $2,794,984.33 note. Although it is impossible to accurately predict the value of this property three years in the future, if the Court were to consider the net income after three years of $292,570.20 as a stabilized net income figure and apply to that a capitalization rate of .12 (the figure utilized at the Section 362 hearing) a value of only $2,438,085 would be derived. This value is clearly insufficient to pay off the note.

If the Court assumes a 10% income increase, debtor's ability to meet its plan obligations becomes better, but, nevertheless, unconvincing. Cure costs and current debt service could be met but with a $2,400,000 mortgage there would still be a cash shortfall of $239,715.26. It is clear that debtor's $60,000 proposed equity infusion would not dent this. Debtor suggests the possibility of secondary mortgage financing [17] to meet the shortfall but, realistically speaking, first mortgage financing would first have to be secured. If the coverage ratios used above are kept constant, but income is increased by 10% to $370,097.96, it is easily seen that the maximum income available for debt services ranges from $296,078.37 to $278,269.14. A 1.25 coverage ratio justifies a mortgage at 11.5% and a 1.33 factor justifies a mortgage at only 10.5%. Since the availability of a particular mortgage rate three years hence is entirely speculative, however, debtor is left with a problem. If it is forced to pay a 12.5% interest rate, a rate thought low at the confirmation hearing, income will be insufficient to cover the $314,160 debt service. Given the testimony at trial the Court can only conclude that debtor's ability to refinance is dubious at best. Similarly, the Court is convinced that a sale, even with a 10% income increase, is purely speculative. Assuming that the third year income figure of $370,097.96 is a stabilized figure, and again applying a .12 capitalization rate, the value of the premises would compute to $3,084,149.67–a price sufficient to pay off the note. Two questions arise, however: (1) would the debtor be able to find a purchaser at the end of the three year period at that price, and (2) would the sale be for cash. The answer to question (1) is not known and question (2) probably must be answered in the negative because any new purchaser would have the same difficulty obtaining mortgage financing as the debtor. Since a cash sale is improbable, a pay off of the mortgage note is, at best, unlikely.

The Court has discussed the cost of curing deferred maintenance and the income and expenses of the project over the next three years. In the Court's opinion fulfillment of the plan by the debtor is not possible if its "best judgment" figures are utilized. Furthermore, even assuming a 10% income increase, fulfillment of the plan's conditions is highly doubtful. In the Court's judgment it is more probable than not that confirmation of a plan would likely be followed either by a liquidation or further reorganization proceedings. Thus, the debtor has not fulfilled the requirements of Section 1129(a)(11) and confirmation of the debtor's plan, as modified, must be denied.

## RELIEF FROM STAY

At the hearing on City's complaint for relief from the automatic stay the stay was continued only to allow the debtor a hearing on confirmation of its plan. Since confirmation has been denied, the stay must be vacated.

### EXHIBIT 1

#### PLAN ASSUMING 15% RATE

##### Assumptions

| | | |
|---|---|---|
| 1. | Value of Collateral | $2,260,000.00 |
| 2. | Annual Interest @ 15% | 339,000.00 |
| 3. | Monthly Interest @ 15% | 28,250.00 |
| 4. | Interest for 15 months | 423,750.00 |

##### Analysis

| | |
|---|---|
| Present Value of Note | 2,260,000.00 |
| Accrued Interest | 423,750.00 |
| Interest on accrued interest @ 15% | 111,234.38 |
| Face Amount of Note | $2,794,984.38 |

pay was $100,000. Thus, the debtor would still be short almost $80,000 as shown below:

| | |
|---|---|
| Note | $2,794,984.38 |
| 1st mortgage | 2,400,000.00 |
| 2nd mortgage | 100,000.00 |
| Equity | 60,000.00 |
| Cash flow | 155,269.12 |
| Shortage | 79,715.26 |

17. Assuming a 10% income increase debtor's net income at the end of the third year would be $370,097.96. *See* Exhibit 6. On an assumption of $400,000 of net income debtor's expert calculated that the maximum second mortgage available at a price debtor would be willing to

## EXHIBIT 2

### DEFERRED MAINTENANCE

| | |
|---|---|
| Apartment prep. | |
| Hallways | |
| Mailboxes | |
| Lighting | $87,000.00 |
| Appliances | $6,091.00 |
| Heating Plant | $20,000.00 |
| Hot Water | $5,000.00 |
| Air Conditioning | $5,000.00 |
| Insulation | $27,300.00 |
| Gutters | $6,000.00 |
| Driveways | |
| Concrete | |
| Landscaping | $20,000.00 |
| Exterior Painting | $20,000.00 |
| Exterior Door | $4,500.00 |
| Sign | $2,000.00 |
| Pool | $10,000.00 |
| | $212,891.00 say $213,000.00 |
| Contingencies | $50,000.00 or say $16,700.00 per year |
| Total Deferred Maintenance | $263,000.00 |

## EXHIBIT 3

### THREE–YEAR INCOME PROJECTION

#### YEAR 1

| | |
|---|---|
| Gross Income | $700,861.00 |
| Management Units | (7,200.00) |
| Vacancy & Credit Loss | |
| 1st 3 mos. 10% | (17,286.60) |
| 2nd 3 mos. 8% | (13,936.32) |
| Next 6 mos. 6% | (21,197.46) |
| Misc. Income | 11,328.00 |
| Net Income | $652,568.62 |

#### YEAR 2

| | |
|---|---|
| Gross Income | $757,816.80 |
| ($59,020) (12) (107%) | |
| Management | (7,704.00) |
| Vacancy & Credit Loss (6%) | (45,469.01) |
| Misc. Income | 12,000.00 |
| Net Income | $716,643.79 |

#### YEAR 3

| | |
|---|---|
| Gross Income | $810,863.98 |
| ($757,816.80) (107%) | |
| Management | (8,243.28) |
| Vacancy & Credit Loss (5%) | (40,543.20) |
| Misc. Income | $13,200.00 |
| Net Income | $775,277.50 |

## EXHIBIT 4

### THREE–YEAR EXPENSE PROJECTION

#### EXPENSES

| Category | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| R. E. Taxes | 71,004.00 | 73,740.00 | 76,536.00 |
| Water/Sewer | 34,400.00 | 37,440.00 | 37,440.00 |
| Electric | 60,447.00 | 67,697.00 | 75,819.00 |
| Gas | 8,221.00 | 9,204.00 | 10,300.00 |
| Oil | 81,000.00 | 93,150.00 | 107,122.00 |
| Insurance | 18,000.00 | 18,000.00 | 18,000.00 |
| Payroll | 65,000.00 | 60,000.00 | 64,000.00 |
| Main./Grounds | 15,000.00 | 16,350.00 | 17,821.50 |
| Trash | 5,265.00 | 5,880.00 | 6,432.00 |
| Mgt. Fee @ 4% | 26,102.74 | 28,665.75 | 30,686.79 |
| Office Admin. | 4,914.00 | 5,382.00 | 5,895.00 |
| Advertising | 5,100.00 | 5,256.00 | 5,760.00 |
| Apt. Prep. | 15,000.00 | 15,900.00 | 16,854.00 |
| Supplies | 3,060.00 | 3,199.00 | 3,390.00 |
| Other Operating | 1,000.00 | 1,040.00 | 1,082.00 |
| Recreation | 5,000.00 | 5,304.00 | 5,569.00 |
| | $418,513.74 | $446,207.75 | $482,707.29 |

#### YEAR 1 COMPARISON

| | L–1 Ev. (Debtor) | C–2 Ev. (City) | Court |
|---|---|---|---|
| | EXPENSES | | |
| Real estate taxes | $71,040 | $71,004 | $71,004 |
| Water/Sewer | 34,400 | 40,800 | 34,400 |
| Electric | 60,447 | 57,020 | 60,447 |

## EXHIBIT 5

### YEAR 1 COMPARISON

| | L–1 Ev. (Debtor) | C–2 Ev. (City) | Court |
|---|---|---|---|
| **EXPENSES** | | | |
| Gas | 8,221 | 7,502 | 8,221 |
| Oil | 61,807 | 97,890 | 81,000 |
| Insurance | 18,000 | 17,904 | 18,000 |
| Payroll | 41,964 | | 65,000 |
| Maintenance/Grounds | 22,570 | | 15,000 |
| Office/Administrative | 4,914 | | 4,914 |
| Other payroll | | 22,827 | |
| Maintenance | | 43,263 | |
| Grounds | | 11,422 | |
| Other Administrative | | 30,094 | |
| Supplies | | 3,060 | 3,060 |
| Trash | 5,265 | 5,090 | 5,265 |
| Management fee | 27,981 | 37,115 | 26,102.74 |
| Apartment prep/painting | 12,285 | 16,416 | 15,000 |
| Advertising | 5,100 | | 5,100 |
| Other taxes | | 1,644 | |
| Other operating | | 3,058 | 1,000 |
| Recreational | | 5,000 | 5,000 |
| **TOTAL EXPENSE** | $373,994 | $471,109 | $418,513.74 |
| Gross Income | $699,603 | $618,577 | $652,568.62 |
| NET INCOME | $325,609 | $147,468 | $234,054.88 |

## EXHIBIT 6

### THREE-YEAR RECAP

#### I. INCOME AND EXPENSE

**A. Best Judgment**

| | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Income | $652,568.62 | $716,643.79 | $775,277.50 |
| (Expense) | 418,513.74 | 446,207.75 | 482,707.29 |
| Net available | 234,054.88 | 270,436.04 | 292,570.20 |
| (Cure) | 229,591.00 | 16,700.00 | 16,700.00 |
| (Debt Service) | –0– | 254,250.00* | 339,000.00 |
| Surplus (Deficit) | 4,463.88 | (513.96) | (63,129.79) |
| Cumulative Surplus (Deficit) | 4,463.88 | 3,949.92 | (59,179.87) |

**B. Assume 10% Income Increase (Everything Else Constant)**

| | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Income | $717,825.48 | $788,308.17 | $852,805.25 |
| (Expense) | 418,513.74 | 446,207.75 | 482,707.29 |
| Net available | 299,311.74 | 342,100.42 | 370,097.96 |
| (Cure) | 229,591.00 | 16,700.00 | 16,700.00 |
| (Debt Service) | –0– | 254,250.00* | 339,000.00 |
| Surplus (Deficit) | 69,720.74 | 71,150.42 | 14,397.96 |
| Cumulative Surplus (Deficit) | $ 69,720.74 | $140,871.16 | $155,269.12 |

* Interest costs for 9 months

#### II. REFINANCING

| | |
|---|---|
| Note | 2,794,984.38 |

**A. Best Judgment**

| | |
|---|---|
| 1st mortgage (assumed) | 2,400,000.00 |
| Deficit Cash Flow | (59,179.87) |
| Shortfall | $454,164.25 |

**B. Assume 10% Income Increase**

| | |
|---|---|
| 1st mortgage (assumed) | 2,400,000.00 |
| Cash flow | 155,269.12 |
| Shortfall | 239,715.26 |