**In re GEORGETOWN LIMITED PARTNERSHIP, Debtor.**

**In re CARRINGTON WOODS LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy Nos. 96–50885, 96–50884.**

United States Bankruptcy Court, M.D. Georgia, Macon Division.

March 28, 1997.

---

Wesley J. Boyer, Katz, Flatau, Popson & Boyer, Macon, GA, for Debtors.

Ward Stone, Jr., Stone & Baxter, L.L.P., Macon, GA, for Nathaniel E. Smith.

Allan G. Overton, Burr & Forman, Atlanta, GA, for Beal Bank, S.S.B.

Cater C. Thompson, Jones, Cork & Miller, Macon, GA, for Central & Southern Bank of Georgia.

Mark W. Roadarmel, Assistant United States Trustee, Macon, GA, for United States Trustee.

### MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on Objections to Confirmation by Beal Bank, S.S.B. ("Beal Bank") and Citizens and Southern Bank of Georgia ("C & S Bank"). This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(L). After considering the pleadings, evidence presented and applicable authorities, the Court enters the following findings of fact and conclusions of law in compliance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

Georgetown Limited Partnership ("Georgetown") and Carrington Woods Limited Partnership ("Carrington Woods") are limited partnerships with Nathaniel E. Smith ("Smith") as the sole general partner and C & S Bank as the sole limited partner. Smith has a 99% ownership interest, and C & S Bank has a 1% ownership interest in both limited partnerships (collectively, "Debtors"). In addition, C & S Bank holds a collateral pledge of Smith's general partnership interest to secure a loan in Smith's name in the amount of $1,500,000.00 and an unsecured direct claim against Debtors in the amount of $46,904.92.

The primary asset of each partnership is an apartment complex in Milledgeville, Georgia. The complex owned by Carrington Woods consists of two one-story brick veneer buildings, containing a total of 6,488 square feet, two one-and-one-half-story wood frame buildings containing a total of 5,632 square feet, three two-story brick structures containing a total of 25,440 square feet, one two-

story frame building containing a total of 7,344 square feet, and five two-story wood frame buildings containing a total of 19,904 square feet. All of these buildings were built between 1967 and 1995 and contain a total of 64,810 leasable square feet. Occupancy has been nearly 100% in recent years, yielding a gross income of approximately $388,000 annually and a net income of approximately $150,000 annually.

The apartment complex owned by Georgetown consists of consists of eight two-story brick veneer buildings containing a total of 6,336 square feet, two two-story frame buildings containing a total of 2,560 square feet, one two-story frame building containing 3,920 square feet, and nine two-story wood frame buildings containing a total of 3,136 square feet. There is a total of 91,020 leasable square feet for which occupancy has averaged 95% in recent years. This complex produces gross rental income of approximately $440,000 annually and net income of approximately $200,000 annually.

The Carrington Woods and Georgetown apartments were both acquired by Debtors on December 15, 1987 and financed through the United States Department of Housing and Urban Development ("HUD"). The initial loan for the Carrington Woods complex was for $1,155,000 and was repayable over thirty-six years with interest calculated at 10% per anum. The initial loan for the Georgetown complex was for $1,750,000 and was, likewise, repayable over thirty-six years with interest calculated at 10% per anum.

In the early 1990s, Debtors defaulted on both loans, causing HUD to commence foreclosure proceedings. These proceedings were interrupted by the filing of Debtors' first Chapter 11 petitions on November 15, 1994. In those cases, HUD filed Motions for Relief from the Automatic Stay and/or to Dismiss the Case. On July 28, 1995, the Court granted relief from the stay in both cases and dismissed both cases with prejudice such that Debtors were prohibited from refiling bankruptcy until the earlier of the consummation of the sale of HUD's notes or the expiration of 120 days from the entry of the order.

In October of 1995, HUD sold the mortgages to Beal Bank, now Debtors' sole secured creditor. The present cases were commenced when Debtors filed separate Chapter 11 petitions on March 4, 1996; separate plans of reorganization and disclosure statements were filed on June 3, 1996. The disclosure statements were amended on October 3, 1996. The Court approved the disclosure statements, as amended, on October 7, 1996. Since the cases concern similar properties and similar secured loans, and, further, since the plans are identical in structure and repayment provisions, the confirmation hearings for both cases were consolidated and held on November 5–6, 1996. In these cases, Beal Bank's financial relationship with Debtors can be summarized as follows:

Georgetown
claim amount = $2,093,695.38
property value = $1,500,000.00

Carrington Woods
claim amount = $1,420,935.82
property value = $1,250,000.00

Beal Bank has exercised its rights under § 1111(b) to be treated as fully secured in both cases. Debtors' plans propose to pay Beal Bank at the 10% interest rate as originally set forth in the loan agreement with HUD. Accordingly, the plans provide for approximate monthly payments of $19,000 for the Georgetown loan and $13,000 for the Carrington Woods loan.

In addition, Debtors' plans propose to classify C & S Bank's unsecured claim in Class 5 rather than in Class 6 with the other unsecured claims. This $46,904.42 Class 5 unsecured claim held by C & S Bank would be paid over sixty months at an interest rate of 8%. Georgetown would pay 53% of the amount, and Carrington Woods would pay 47% of the amount. The Class 6 claims, on the other hand, would be paid in full within six months of the effective date of the plans without interest. All of the claims proposed to be treated in Class 6 are held by Debtors' unsecured trade creditors. Class 6 claims for Carrington Woods total approximately $2,400, and Class 6 claims for Georgetown total approximately $3,100.

The plans also propose to cure deferred maintenance amounts for both complexes. The Court finds the deferred maintenance to be $35,000 on the Carrington Woods proper-

ty and $65,000 on the Georgetown property. Photographs of the properties that were submitted into evidence do not show a need for more substantial repairs. In any event, financial projections provided by Debtors include adequate expense provisions to pay these deferred maintenance expenses.

At the confirmation hearing, an issue was made of several withdrawals by Smith from funds of Debtors. Within a year prior to the filing of these Chapter 11 cases, Smith drafted a number of checks from Debtors' accounts which were made payable to either "Nat Smith and Associates" or Smith himself. According to Debtors' Statements of Financial Affairs ("Statements"), the total amounts distributed were as follows:

Amount (Source of funds)(description on Statements)
$56,710 (Georgetown)(payments to insider creditor)
$58,294 (Georgetown) (management fees)
$50,290 (Carrington Woods)(payments to insider creditor)
$45,809 (Carrington Woods) (management fees)

---

The Court finds the combined amounts listed in Debtors' Statements as "payments to an insider creditor" for Georgetown and Carrington Woods to be at least $15,593.76 less than actual amounts paid to insider creditors.[1]

In addition to receiving these funds, Smith also received payments of $27,000 [2] and $22,400 [3] more than two months *after* the filing of this bankruptcy petition. These payments were distributed from a "Mutual Escrow Account" which was used by both Debtors. Smith testified that this account was a management account used as a "pass through"

for paying expenses common to both Debtors.

At the confirmation hearing, Debtors submitted financial projections under the proposed plan into evidence. The income figures project a 5% increase in rent each year. The expense figures project a 4% increase each year. The proposed plans provide that all withdrawals of capital by Nat Smith and Associates and by Smith himself would be repaid by management services. Thus, the financial projections do not include a management fee expense for the first nine months of the plan. Smith stated that this format would allow Debtors to recover all of the capital withdrawn by the end of that nine

1. A number of checks were submitted into evidence which support this conclusion. The source account of each of these checks was the "Mutual Escrow Account" discussed infra. The payee of each of the checks in question was one of the following: (1) First National Bank of Baldwin County—Account 101796–1 ("FNB"), (2) Exchange Bank—Account 308664 ("Exchange Bank"), or (3) N.E. Smith or Nathaniel E. Smith ("Smith"). The FNB and Exchange Bank accounts are both personal accounts held by Smith. The following checks were submitted to the Court:

| Date | Payee |
|------|-------|
| 10/20/95 | FNB |
| 10/20/95 | FNB |
| 11/22/95 | Nathaniel E. Smith |
| 12/14/95 | Exchange Bank |
| 12/14/95 | FNB |
| 01/10/96 | FNB |
| 02/16/96 | Exchange Bank |
| 02/23/96 | N.E. Smith |

| Amount | Exhibit No. |
|--------|-------------|
| $ 6,805.00 | 32 |
| $ 2,000.00 | 32 |
| $ 7,000.00 | 61 |
| $ 1,263.71 | 35 |
| $60,000.00 | 36 |
| $ 2,806.00 | 39 |
| $ 2,719.05 | 41 |
| $40,000.00 | 42 |

These checks total $122,593.76. The combined amount listed in the Statements as payments to insider creditors was $107,000.00. Thus, there is a difference of $15,593.76 which was never disclosed in the Statements.

2. This payment was made by a check dated April 24, 1996 for which the payee was "N.E. Smith."

3. This payment was made by a check dated May 22, 1996 for which the payee was Smith's personal account at First National Bank of Baldwin County.

month period, at which time payment of the management fee would resume.[4]

According to the projections, Debtors show a loss for the first four years of the plans. However, during this period, the amount of loss decreases each year, and Debtors' net operating incomes remain positive. Yet, it is not until after the fourth year of the plan that Debtors show any profit.

### Conclusions of Law

The requirements for confirmation of a Chapter 11 plan are enumerated in 11 U.S.C. § 1129. Beal Bank and C & S Bank raise four common objections to confirmation of Debtors' Plans:

(1) That the bankruptcy cases were not filed in good faith, and the plans were not proposed in good faith;

(2) That the plans are not feasible;

(3) That the unsecured claim of C & S Bank was improperly classified in a class separate from the unsecured trade creditors, and that the trade creditor class is artificially impaired; and

(4) That the continuance of present management, as proposed in the plans, is not in the best interest of the estate.

### Good Faith Requirement

According to 11 U.S.C. § 1129(a)(3), a plan can only be confirmed if, "[t]he plan has been proposed in good faith and not by any means forbidden by law." In determining whether the good faith requirement is met, it is proper to look at the plan proponent's post-petition actions; good faith under Section 1129(a)(3) is not determined by examining the proponent's behavior prior to the filing of the bankruptcy petition. *See Matter of Fiesta Homes of Georgia, Inc.*, 125 B.R. 321, 325 (Bankr.S.D.Ga.1990). However, pre-petition actions of the plan proponent are relevant when determining whether a petition was filed in good faith. The Eleventh Circuit has held that where a court finds a petition to be filed in bad faith, "the taint of [such pre-petition conduct] must naturally extend to any subsequent reorganiza-

tion proposal; thus any proposal submitted by a debtor who filed his petition in bad faith would fail to meet section 1129's good faith requirement." *Natural Land Corp. v. Baker Farms, Inc. (In re Natural Land Corp.)*, 825 F.2d 296, 298 (11th Cir.1987). Accordingly, the Court must examine good faith at two levels (1) the filing of the petition and (2) the proposal of a plan of reorganization.

Courts have found a lack of good faith in the filing of a petition for reorganization where there has been "'an intent to abuse the judicial process and the purposes of the reorganization provisions.'" *Id.* (quoting *Albany Partners Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir.1984)). For single asset real estate cases in Chapter 11, the Eleventh Circuit has enumerated the following factors as indicative of bad faith:

(1) The Debtor has only one asset, the Property, in which it does not hold legal title;

(2) The Debtor has few unsecured creditors whose claims are small in relation to the claims of the Secured Creditors;

(3) The Debtor has few employees;

(4) The Property is the subject of a foreclosure action as a result of arrearages on the debt;

(5) The Debtor's financial problems involve essentially a dispute between the Debtor and the Secured Creditors which can be resolved in the pending State Court Action [if any]; and

(6) The timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditors to enforce their rights.

*In re Phoenix Piccadilly Ltd.*, 849 F.2d 1393, 1394 (11th Cir.1988). The above factors are not exhaustive, and no single factor is determinative. *Id.* A Bankruptcy Court case in the Northern District of Georgia has proposed a more extensive list of factors to

---

**4.** The plans propose that his compensation be based upon the calculations used under the HUD loan operating agreement (9.8% per month of gross revenues for Georgetown and 9.75% of gross revenues for Carrington Woods).

consider in determining whether a petition was filed in good faith:[5]

1. Whether the debtor has few or no unsecured creditors;

2. Whether there has been a previous bankruptcy petition by the debtor or a related entity;

3. Whether the pre-petition conduct of the debtor has been improper;

4. Whether the petition effectively allows the debtor to evade court orders;

5. Whether there are few debts to non-moving creditors;

6. Whether the petition was filed on the eve of foreclosure;

7. Whether the foreclosed property is the sole or major asset of the debtor;

8. Whether the debtor has no ongoing business or employees;

9. Whether there is no possibility of reorganization;

10. Whether the debtor's income is not sufficient to operate;

11. Whether there was no pressure from non-moving creditors;

12. Whether reorganization essentially involves the resolution of a two-party dispute;

13. Whether a corporate debtor was formed and received title to its major assets immediately before the petition; and

14. Whether the debtor filed solely to create the automatic stay.

*Northwest Place, Ltd. v. Cooper (Matter of Northwest Place, Ltd.),* 73 B.R. 978, 981 (Bankr.N.D.Ga.1987). Consideration of these factors is "'subject to judicial discretion under the circumstances of each case.'" *Albany Partners,* 749 F.2d at 674 (quoting *In re Nancant,* 8 B.R. 1005, 1006 (Bankr. D.Mass.1981)).

■ In the instant cases, many of these factors are present. Debtors are essentially single asset partnerships which have only a few unsecured creditors whose claims are small in relation to the claims of the secured creditor (Beal Bank); Debtors only have a few employees (they share three primary employees); Debtors filed these cases the day before Beal Bank's scheduled foreclosure on the properties; these cases are Debtors' second attempts at reorganization (the first cases were dismissed with prejudice on July 28, 1995); and the pre-petition conduct of Debtors has been, at the very least, questionable (in the year prior to bankruptcy, at least $122,593.76 of Debtors' funds were paid to Smith at a time when Debtors were obviously having financial difficulties). This combination of factors suggests that the petitions were filed in bad faith. These bad faith filings necessarily "taint" the reorganization proposals of Debtors. *See Natural Land,* 825 F.2d at 298. This "taint", by itself, may be enough to cause the proposed plans to fail the good faith requirement of Section 1129(a)(3). Nonetheless, the Court will examine the plans themselves in order to determine whether they were proposed in good faith.

■ With regard to the Section 1129(a)(3) good faith requirement, the Eleventh Circuit stated:

[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has reasonable hope of success, the good faith requirements of section 1129(a)(3) are satisfied [citations omitted]. The focus of a court's inquiry is the plan itself, and courts must look to the totality of circumstances surrounding the plan [citations omitted], keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start [citations omitted].

*McCormick v. Banc One Leasing Corp. (In re McCormick),* 49 F.3d 1524, 1526 (11th Cir.1995). In viewing the totality of circumstances, the Court is to look at the post-petition actions of the plan proponent. *Fiesta Homes,* 125 B.R. at 325.

■ The failure to disclose relevant information in a bankruptcy case has been held to be a sufficient basis for finding bad faith in the proposal of a plan. *See Big Shanty Land Corp. v. Comer Properties, Inc.,* 61 B.R. 272, 281 (N.D.Ga.1985). A subsequent amending of the disclosure statement to in-

---

**5.** Some of the factors are similar to those listed in *Phoenix Piccadilly.*

clude the omitted information will not vitiate such bad faith. *Id.*

The Court has serious concerns upon examination of Smith's post-petition actions. He received post-petition payments from Debtors (through the Mutual Escrow Account) in the amounts of $27,000 and $22,400 without Court permission. Since the Mutual Escrow Account was used by both Debtors (to pay common expenses) it is property of the estate. Smith failed to list the account as an asset in both Debtors' Schedules, and then attempted to conceal the two post-petition payments to himself by drafting the checks from this undisclosed account.

When this scheme was revealed, Debtors tried to rectify the wrongdoing by proposing a plan which provides no compensation for Smith for its first nine months of the plan. The stated purpose is to effectuate a return of the capital which Smith paid himself through the pre-petition and post-petition transfers in question. This is not the "honest but unfortunate debtor" that our system of bankruptcy envisions. Thus, the Court finds the proposed plans to fail the Section 1129(a)(3) test of good faith.

### *Feasibility*

In order to confirm a proposed plan, it is required that "[c]onfirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This requirement is often referred to as the feasibility standard. The factors which a court should consider in determining whether the feasibility standard is met include the following:

(1) the adequacy of the capital structure;

(2) the earning power of the business;

(3) economic conditions;

(4) the ability of management;

(5) the probability of the continuation of the same management; and

(6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Collier on Bankruptcy,* ¶ 1129.02[11] (15th ed.1996) (citing *In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653, 659 (Bankr.D.N.J. 1980)). While a plan is not required to guarantee a successful reorganization, a court must examine whether the debtor can realistically carry out the provisions of the plan, and whether the plan offers a reasonable prospect of success. *Matter of IPC Atlanta Ltd. Partnership,* 142 B.R. 547, 559 (Bankr. N.D.Ga.1992).

In the present cases, the Court finds that the proposed plans are not feasible because they fail to offer a reasonable probability of success. There are essentially two problems: (1) the financial projections do not favor success and (2) the management has proven itself to be incapable of creating financial stability for Debtors.

According to Debtors' own financial projections,[6] under the plan as proposed, Debtors cash flow would decrease for the first four years of the plan.[7] Showing a loss in the beginning of the life of the plan is not unusual. On the other hand, netting losses for four years suggests that reorganization will not succeed. Of course, during that time, substantial debt reduction will be occurring. Furthermore, during the fifth year, the projections indicate that Debtors will begin showing profits thereby causing a positive

---

**6.** These projections include an expense for deferred maintenance. The expense figures for each plan were based upon the deferred maintenance amounts of $35,000 for Carrington Woods and $65,000 for Georgetown which the Court has found to be accurate.

**7.** The balances in Debtors' operating accounts would remain positive throughout the plan even though those balances will decrease during the first four years. These decreasing balances are not, in themselves, fatal to the plans. However,

the Court notes that the only reason that the balances of the operating accounts will not fall below zero in this four year period of losses is because the automatic stay created by the first Chapter 11 filings allowed Debtors to accumulate substantial sums from rental income during the pendency of the automatic stay in the previous cases from July 28, 1994 (the time of filing) until July 28, 1995 (when the cases were dismissed with prejudice).

increase in cash flow, a trend which is projected to continue in future years.

However, it is not merely this delay in the ability to show a profit which is troublesome. The true detriment to this plan's feasibility is in the basis for the projections themselves. The figures were calculated upon an estimated 5% increase in rent each year coupled with a 4% increase in expenses. These percentages are both optimistic and convenient. Even with these favorable assumptions, it still takes until the fifth year for Debtors to see an actual profit. The Court cannot, with clear conviction, rule that such plans are feasible.[8]

In addition to complaining about the ambitious financial projections, Beal Bank has voiced a concern about the continued management by a general partner who has, to date, been unable to create financial stability for Debtors. By his own pleadings and testimony, Smith claims that Debtors have enjoyed occupancy of 95% or higher in recent years. It is tempting to conclude that Debtors' inability to show profits with occupancy at this high level can only reflect poorly upon Smith's management ability. The true picture, however, may be more complex. If Debtors' secured debt was too large to be serviced by its cash flow, fatal consequences would follow. On this narrow point, there was insufficient evidence to conclude that management deficiencies rendered the plans not feasible.[9]

### Claim Classification

Beal Bank and C & S Bank also objected to confirmation on the grounds that C & S Bank's claim was improperly classified, and that the trade creditor class is artificially impaired. They contend that the C & S Bank claim (Class 5) should be classified with the other unsecured claims (Class 6), and that the separate classification was a scheme by Debtors to artificially impair Class 6 in order to fulfill the Section 1129(a)(10) confirmation requirement that at least one impaired class accept the plan.[10] Each of these objections will be addressed separately.

Classification of claims or interests is governed by Section 1122 of the Bankruptcy Code which states the following:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

There has been a split in authority regarding whether, in light of Section 1122, all unsecured claims must be placed in the same class. This Court agrees with the flexible approach to this question followed in a Bankruptcy Court case in the Northern District of Georgia. According to that Court:

Some courts take a rigid, inflexible approach to this question and generally conclude that all unsecured claims must be classified together unless a separate class is reasonable and necessary for administrative convenience under [Section

---

**8.** The problem with feasibility is easier to understand if one considers the fact that the debt to be repaid exceeds the fair market value of the two properties. The valuation of properties such as these is determined, in part, on projected cash flow. If Debtors were in a position to strip down Beal Bank's liens to the fair market value of the property and discharge the unsecured deficiency, the financial projections might reflect a feasible plan. It should be no surprise to see that the financial projections show that the properties cannot support repayment of a debt substantially in excess of their fair market values. To that extent, the financial projections truthfully represent the financial realities of the case. The arbitrary increases together with the cash cushion do

not provide the solid footing necessary to find that this plan is feasible.

**9.** This analysis assumes that there is a distinction between management skills and a willingness to misappropriate funds. Mr. Smith has evidenced a measure of both attributes.

**10.** Section 1129(a)(10) states that a plan will only be confirmed:

If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

1122(b) ].... However, other cases take a more flexible and pragmatic approach to the issue and conclude that Section 1122(a) does not require that similar claims necessarily must be placed in the same class.... The cases that follow the flexible approach emphasize that Section 1122 does not mandate that all claims of equal rank "must be" classified together. Rather, the statute requires that claims grouped together in the same class must be homogeneous.... This court is of the view that Congress intended Section 1122 to provide plan proponents wide latitude in classifying claims. Such flexibility both promotes the rehabilitative purposes of Chapter 11 reorganization and enables plan proponents to deal with complex commercial realities which debtor estates often confront.

*In re Atlanta West VI,* 91 B.R. 620, 625–26 (Bankr.N.D.Ga.1988).

This flexibility, however, is not unlimited. " '[T]here must be some limit on a debtor's power to classify creditors ... The potential for abuse would be significant otherwise.' " *Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell Corp.),* 913 F.2d 873, 880 (11th Cir.1990) (quoting *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.,* 800 F.2d 581, 586 (6th Cir.1986)). For example, if classifications are designed in order to manipulate class voting, the plan cannot be confirmed. *Id.*

Beal Bank and C & S Bank contend that the separate classification of the C & S Bank claim in Class 5 is part of a scheme to artificially impair Class 6 for Section 1129(a)(10) purposes. The Court disagrees. There has been no attempt to manipulate class voting in either case. The differences between the C & S Bank claim and the claims of the other unsecured creditors justify separate classification. Where, in order to successfully reorganize, it is necessary for a debtor to continue conducting business with certain unsecured creditors, a debtor is justified in separately classifying those creditors from other unsecured creditors. *See In re AG Consultants Grain Division, Inc.,* 77 B.R. 665, 676 (Bankr.N.D.Ind.1987). Here, those creditors proposed to be treated in Class 6 are trade creditors with whom Debtors intends to have a continuing business relationship. It is reasonable to predict that no continuing business relationship between Debtors and C & S Bank is possible. By itself, this is a sufficient reason for the separate classifications.

In addition, the C & S Bank claim is significantly larger than the other unsecured claims. As such, it will be necessary to repay the C & S Bank claim over a longer period of time (five years). The Class 6 claims are proposed to be paid in full over the first six months of the plans. This unavoidable difference in treatment also justifies separate classification.

The Court finds that the separate classification of the Class 5 C & S Bank claim and the other unsecured Class 6 claims is justified. There has been no manipulation of the classes for voting purposes. Thus, confirmation will not be denied based upon the classification objection.

### Continuance of Present Management

The final objection to confirmation was that the continuance of present management was not in the best interest of the estates. In light of the Court's decision to deny confirmation, resolution of this matter in not necessary at this time.

An order in accordance with this memorandum opinion will be entered on this date.

### ORDER

In accordance with the Memorandum Opinion entered on this date, it is hereby

ORDERED that confirmation of the Plans Of Reorganization proposed by the Debtors in the above captioned cases is DENIED.

