BIG SHANTY LAND CORPORATION, et al., Appellants,

v.

COMER PROPERTIES, INC., et al., Appellees.

Civ. A. Nos. C84–2436A, C85–1888A, C85–1957A and C85–2166A.

United States District Court, N.D. Georgia, Atlanta Division.

Oct. 4, 1985.

---

Gus H. Small, Zusmann, Small, Stamps & White, Atlanta, Ga., for Big Shanty.

Robert Hicks, Charles Campbell Hicks, Maloof & Campbell, Atlanta, Ga., for Crow Land.

James E. Massey, Hurt, Richardson, Garner, Todd & Cadenhead, Atlanta, Ga., for Crow-Childress-Mobley.

Alfred S. Lurey, Stephen R. Beckham, Kilpatrick & Cody, Atlanta, Ga., for Stricklin.

Grant Stein, Alston & Bird, Atlanta, Ga., for Comer Properties.

James C. Bussart, Fraser & Bussart, Atlanta, Ga., for Rufus Guthrie.

## ORDER

SHOOB, District Judge.

This Chapter 11 bankruptcy case presents the rare spectacle of a solvent debtor whose sole asset, a valuable tract of undeveloped real estate, is the object of a fierce bidding war. Presently before the Court are consolidated appeals involving three orders of the Bankruptcy Court. Although the Court will not reverse the appealed orders, it seriously doubts that the Bankruptcy Court should continue acting as a referee in the parties' dispute.

The following is a truncated version of the complicated factual background underlying this case but should suffice for present purposes. On July 29, 1983, Richard E. Thomasson[1] ("Thomasson"), an attorney, real estate broker, and restaurateur, purchased from New Shanty Joint Venture ("New Shanty") a 250 acre tract of undeveloped land located in Cobb County, Georgia. To finance the purchase, Thomasson executed and delivered to New Shanty a purchase money note of approximately five and three-quarter million dollars and a security deed. Prior to closing on the property, New Shanty released from the security deed 40 acres of the tract but retained its security interest in the remaining 210 acres. Helen C. Burt and Frank Burt, Jr., possessed a first priority security deed in the 210-acre tract, which secured a debt of approximately three hundred thousand dollars.[2]

In the spring and summer of 1984, Thomasson was experiencing serious financial difficulty. Not only was Thomasson involved in a hotly disputed divorce proceeding, but he was also required to make a substantial payment on the New Shanty deed on July 29, 1984. On May 31, 1984, Thomasson formed appellant Big Shanty Land Corporation ("Debtor"). Thomasson is debtor's sole shareholder, president, and chief executive officer, and the 210-acre tract is debtor's sole asset. Because Thomasson was unable to make the payment due on the New Shanty deed, he caused debtor to file the instant Chapter 11 bankruptcy on August 8, 1984.

As the Bankruptcy Court noted, the 210-acre tract is located in a rapidly developing area. As a result, the Bankruptcy Court was quickly inundated with potential buyers. The bidding contest finally narrowed to the rival factions represented in the instant appeals. Appellee Stricklin & Company ("Stricklin") made an offer, which, it alleges, Thomasson accepted on September 27, 1984.[3] Stricklin further alleges that Thomasson reneged on this agreement and accepted a bid submitted by Appellant Crow Land Development, Inc. ("Crow").

Obviously, the stakes are high in this case, and, consequently, the parties have litigated with uncommon tenacity. Indeed, there has been much jockeying for position[4] and the record is voluminous. The Court will address each order on appeal in turn, highlighting additional background information when necessary.

### The October 29, 1984 Order

By order dated October 29, 1984, the Bankruptcy Court denied debtor's motion to sell its sole asset pursuant to 11 U.S.C. § 363(b). Arguing that this was error, Crow filed an appeal and motion for leave to appeal.[5] Appellees offer three arguments in opposition to Crow's appeal: (1)

---

1. By order dated August 5, 1985, the Court denied Thomasson's motion to intervene.

2. During the time the instant appeals have been pending, Stricklin acquired the Burt deed.

3. Appellee Rufus Guthrie ("Guthrie") is a real estate agent, whose claim against debtor arises out of Stricklin's alleged deal with Thomasson.

Appellants attack the merits of Guthrie's claim, but that issue is not currently before the Court.

4. For example, Crow has acquired the claim of nominal appellee Comer Properties, Inc. *See also supra* n. 2.

5. Debtor has not appealed the October 29, 1984 order.

that Crow lacks standing to challenge the October 29, 1984 order; (2) that the order is interlocutory and that leave to appeal should not be granted; and (3) that the Bankruptcy Court properly denied debtor's motion to sell under § 363(b).

■ The Court concludes that Crow lacks standing to appeal the October 29, 1984 order. For this reason alone, the Court must dismiss this appeal and deny Crow's motion for leave to appeal. The relevant standard is the "person aggrieved" test, which is designed to limit the number of appeals arising out of bankruptcy cases. *In re Fondiller*, 707 F.2d 441 (9th Cir.1983). "This need springs from the nature of bankruptcy litigation which almost always involves the interests of persons who are not formally parties to the litigation." *Id.* at 443. A litigant qualifies as a person aggrieved if the order in question diminishes his property, increases his burdens, or impairs his rights. *Id.* at 442–43. "Whether an appellant is a 'person aggrieved' is a question of fact for the district court." *In re Ernst, Inc.*, 2 B.R. 757, 760 (S.D.N.Y.1980).

■ In the instant case, Crow's claim to standing is predicated upon its contract with debtor. The denial of debtor's § 363(b) motion had "no direct and immediate impact" on whatever interest Crow may have had, however. *See Fondiller*, 707 F.2d at 443. The Bankruptcy Court did not reject the contract, but rather subjected it to the safeguards provided by Chapter 11.

■ Similarly, the fact that the October 29, 1984 order did not reject Crow's

contract with debtor demonstrates that the order is interlocutory and thus not appealable as a matter of right. *In re Tidewater Group, Inc.*, 734 F.2d 794, 795–96 (11th Cir.1984). The order did not resolve the parties' rights or obligations under the contract but "merely [left] the question open for future adjudication." *In re Merle's Inc.*, 481 F.2d 1016, 1018 (9th Cir.1973).[6]

■ In addition, even if Crow had standing to challenge the denial of debtor's § 363(b) motion, the Court would deny its motion for leave to appeal. The "abuse of discretion" standard of review controls appeals from orders involving motions to sell pursuant to § 363(b), *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir.1983); therefore, the October 29, 1984 order is a "weak candidate for interlocutory review." *Providers Benefit Life Insurance Co. v. Tidewater Group, Inc.*, 22 B.R. 500, 506 (N.D. Ga.1982), *appeal dismissed*, 734 F.2d 794 (11th Cir.1984).

■ Furthermore, there is no indication that the Bankruptcy Court erred in denying debtor's § 363(b) motion. Crow argues that

> Judge Robinson's decision that a debtor cannot sell all of its assets under 363(b) is contrary to all reported case law on the subject.... [T]here are certain circumstances under which the debtor may sell all of its assets under 363(b).

*Brief of Appellant Crow Land Development, Inc.*, at 12. Contrary to Crow's assertion, however, there is nothing in the order of the record to indicate that the Bankruptcy Court thought the proposed sale was barred. Rather, the Bankruptcy Court held that the sale of debtor's sole

---

**6.** The collateral order doctrine enunciated in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949) is inapposite. For the collateral order doctrine to apply, three factors must be present:

> "[1] '[T]he order must conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment.'"

*Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 375 (1981) (quoting *Coopers & Lybrand v.*

*Livesay*, 437 U.S. 463, 468 (1978)); *see also Richardson-Merrill, Inc. v. Koller*, 105 S.Ct. 2757 (1985); *In re Tidewater Group, Inc.*, 734 F.2d 794, 796–97 (11th Cir.1984). As discussed, the October 29, 1984 order did not resolve the validity of the contract at issue. Moreover, the order was factually and conceptually linked to subsequent proceedings involving the confirmation of the reorganization plans submitted. Finally, there is no need for interlocutory review, inasmuch as an order approving the sale of the 210-acre tract to Stricklin could be stayed pending an appeal. Bank.R. 8005.

asset under § 363(b) was unwise in the instant case.[7] Although § 363(b) accords bankruptcy judges broad discretion with respect to sales of a debtor's assets, it must be remembered that § 363(b) sales that, in effect, render nugatory the procedural safeguards provided by Chapter 11 are the exception rather than the rule. Thus, a debtor seeking approval for such a sale bears the burden of articulating a sound business justification for departing from the normal procedure. *See Lionel*, 722 F.2d at 1070–72. Clear jurisdiction exists where the value of debtor's estate will be impaired unless its assets are sold quickly. *E.g., In re Equity Funding Corporation of America*, 492 F.2d 793 (9th Cir.) (per curiam), *cert. denied*, 419 U.S. 964 (1974). Absent clear justification, however, it would seem unwise to second-guess a bankruptcy court's refusal to approve a sale of substantial assets under § 363(b). *See In re Coughlin*, 27 B.R. 632, 635 (B.A.P. 1st Cir.1983) ("In considering the exercise of the bankruptcy court's discretion, the reviewing court does not conduct a balancing test; if there is sound reason for the decision … it does not matter that there are also sound reasons for the opposite result.") (quoting *In re Boston & Maine Corp.*, 618 F.2d 137, 141 (1st Cir. 1980)).

 Crow contends the fact that the sale would have realized sufficient income to satisfy all claims against the estate constitutes a sound business justification.[8] This argument has some merit. Because the contemplated sale would have resolved the outstanding claims and caused a swift

end to the case, the Bankruptcy Court could have properly approved the sale.[9] But, in the Court's view, the failure to do so was not an abuse of discretion.

The Bankruptcy Court was faced with a rapidly changing scenario. At least three parties had expressed interest in the 210-acre tract. Under these circumstances, it was eminently sensible for the Bankruptcy Court to require disclosure in order to facilitate an informed decision by the creditors. Moreover, as was the case in *Lionel*, the value of debtor's property was secure; in fact, it was conceivable that, during the course of the plan procedure, the 210-acre tract could have increased in value as a result of continued bidding.

In sum, the Court will dismiss Crow's appeal of the October 29, 1984 order and will deny its motion for leave to appeal.

### The January 25, 1985 Order

On January 25, 1985, the Bankruptcy Court entered an order denying confirmation of debtor's proposed plan on the ground that it had not been submitted in good faith as required by 11 U.S.C. § 1129(a)(3); the order also barred the approval of Crow's proposed plan. Under both plans, debtor would have sold the 210-acre tract to Crow. The "clearly erroneous" standard controls the Court's review of the relevant findings of fact. *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 56 n. 5 (1982); *In re Reed*, 700 F.2d 986, 992 (5th Cir.1983); Bankr.R. 8013; *see Anderson v. City of Bessemer City*, 105 S.Ct. 1504

---

7. The Bankruptcy Court set forth its reasoning quite lucidly:

> The court believes that the Chapter 11 procedures which call for the debtor in possession and perhaps other interested parties or creditors filing competing plans of reorganization should be adhered to in this case. This will insure full and fair disclosure of all necessary financial background data concerning debtor and its principal…. The court does not know enough about the debtor in possession … to make an informed choice as to which offer is best for the estate. The court will decline to make any choice and leave it to the creditor body to vote in its own best interest.

8. Crow also argues that the Bankruptcy Court's ruling was based on the erroneous view that Stricklin, as a bidder, had standing to object to debtor's § 363(b) motion. The Court agrees that normally a frustrated bidder lacks standing to object to a sale of assets. *See In re Nepsco, Inc.*, 36 B.R. 25 (Bankr.D.Me.1983). Nonetheless, Guthrie and Mrs. Thomasson, who also raised objections to the sale, had standing by virtue of their claims against the estate.

9. The desire to avoid a delay in disposing of a bankruptcy petition is not, in itself, a justification for approving a 363(b) motion. *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir.1983).

(1985); *Trust Company Bank v. MGM/UA Entertainment*, No. 84–8605 (11th Cir. September 27, 1985).

A review of the facts underlying the Bankruptcy Court's finding of bad faith is necessary. Pursuant to the October 29, 1984 order, three plans were proposed. Debtor and Crow filed separate but identical plans providing for the sale to Crow of the 210-acre tract. Stricklin proposed a plan, under which it would purchase the 210-acre tract.

On December 17, 1984, the Bankruptcy Court held a hearing to determine the adequacy of the disclosure statements filed for each of the three plans. Debtor's disclosure statement revealed only the existence of its contract to sell the 210-acre tract (the "210-acre contract") to Crow for $10,874,-545.00 ($51,630.32 per acre), but rigorous cross-examination of Thomasson revealed three related documents. An addendum to the 210-acre contract provided that the stated purchase price would be reduced by $850,000.00, to reflect a credit for "earnest money" paid directly to Thomasson under a stock sale agreement. The stock sale agreement, which was also first revealed at the December 17, 1984 hearing, provided for the sale of debtor's stock to Crow; the purchase price under the stock sale agreement was identical to the purchase price under the 210-acre contract—$10,874,-545.00. The third undisclosed document provided for the sale of the 40-acre tract adjacent to the 210-acre tract.[10] The stated sale price for the 40-acre tract was $1,280,-000.00. The Bankruptcy Court made the following findings of fact with respect to these documents.

The documents, when viewed together, reveal the following:

The 210 Acre Contract provides for the sale of the 210 acre tract to Crow for $51,630.62 per acre, or a total purchase price of $10,874,545.00. The 210 Acre Contract, on its face, appears to bear no relation to any of the other three documents.

The 40 Acre Contract provides for the sale by Thomasson to Crow of the 40 acre tract for $1,280,000.00. This amount represents the price at which Thomasson could purchase the property under an option clause in a divorce decree. Accordingly, the contract is structured to make it appear that Thomasson has no taxable gain on the sale.

The Stock Sale Agreement provides that Thomasson is to receive $200,000.00 earnest money for the sale of the stock, plus $650,000 additional earnest money upon closing of the 40 acre tract. $620,-000.00 of the $650,000.00 is non-refundable, and appears, in substance, to represent a part of the purchase price for the 40 acre tract.

Finally, the Addendum to the 210 Acre contract provides that $850,000.00 will be deducted from the purchase price as a credit for the earnest money paid to Thomasson under the Stock Sale Agreement. Accordingly, the Addendum reveals that the real purchase price for the debtor's property under the 210 Acre Contract is $10,024,545.00, not $10,874,-545.00.

The documents and the testimony in this case reveal a complex scheme which can be summarized as follows:

Under a prior divorce decree, Thomasson was required to pay approximately $650,000.00 in encumbrances on the 40 acre tract. The major encumbrance was about to go into foreclosure. Thomasson also had other business interests and debts that required substantial sums of money. In short, Thomasson was in desperate need of cash.

Crow was willing to alleviate Thomasson's financial problems. Accordingly, Crow paid Thomasson $850,000.00. Approximately $650,000.00 of this sum went to pay off encumbrances on the 40 acre tract, while $200,000.00 was used to pay attorney's fees and other debts.

However, Crow was unwilling to pay more than a certain price per acre for the entire 250 acres of property. According-

**10.** As indicated above, the 40-acre tract was nev-er part of debtor's estate.

ly, the debtor, through Thomasson, executed an Addendum to the 210 Acre Contract which provided that the sums paid personally to Thomasson would be deducted from the purchase price for the 210 acre tract. Thus, the principal and sole shareholder of the debtor corporation received undisclosed, personal financial consideration from Crow. In exchange, it appears that Thomasson caused the debtor to propose a plan favorable to Crow [11]....

The Court concludes that where the president, sole director, sole shareholder, and chief executive officer of a debtor corporation enters into undisclosed side agreements with a prospective buyer of the debtor corporation's property, and where the principal receives undisclosed personal financial consideration from such prospective buyer, a plan caused by the principal to be proposed in favor of such buyer is not proposed in good faith pursuant to 11 U.S.C. § 1129(a)(3). (footnotes omitted)

There is no serious dispute that debtor and Crow should have disclosed all four documents. Nonetheless, appellants vigorously challenge the Bankruptcy Court's finding of bad faith, offering several arguments, including: (1) that Stricklin lacked standing to object to the confirmation of debtor's plan; (2) that the Bankruptcy Court misapprehended the meaning of good faith under § 1129(a)(3); and (3) that the involuntary disclosure of the complete transaction vitiated any bad faith that may have existed.

Appellants' standing argument is without merit. As stated above, the Court agrees that in most cases a bidder lacks standing to object. *See supra* n. 8. However, Stricklin was more than a mere bidder by the time of the December 17, 1984 hearing. Pursuant to the order of the Bankruptcy Court, and with the consent of debtor, Stricklin devoted its time and money to submitting a plan. Thus, the Bankruptcy did not err in classifying Stricklin as a "party in interest" under 11 U.S.C. § 1128(b).[12] *Cf. In re Amatex Corp.*, 755 F.2d 1034, 1041–43 (3d Cir.1985) (term "party in interest" must be defined on a case by case basis under 11 U.S.C. § 1109(b)). Furthermore, appellee Guthrie has asserted a claim against the estate and therefore had standing to object. *See supra* n. 3. Finally, under § 1129(a)(3), regardless of whether Stricklin had standing, the Bankruptcy Court had an independent duty to determine if the plan was submitted in good faith. *In re Landscaping Services, Inc.*, 39 B.R. 588, 590–91 (Bankr.E.D.N.C.1984).

The Court also finds unavailing appellants' argument that the Bankruptcy Court misconstrued the meaning of good faith. According to appellants, bad faith and nondisclosure are separate, unrelated concepts. Bad faith, they assert, speaks to the extent to which a plan realizes the goals of rehabilitating the debtor and fairly resolving claims against the estate; thus, the argument goes, there can be no finding of bad faith here because debtor's plan would have paid all its creditors in full. Appellants further argue that nondisclosure involves the adequacy of a disclosure statement. From this premise, appellants extrapolate that the only proper remedy for nondisclosure is to deny approval of the disclosure statement or to permit an amendment to the disclosure statement. Although the Court agrees that bad faith and nondisclosure are distinguishable, this undisputed proposition does not mean that the terms are mutually exclusive.

The term good faith is not defined in the Bankruptcy Code. In the absence of a precise definition,

---

11. It also appears that the stock sale agreement effectively insulated Crow from any further bidding. If the bidding escalated beyond Crow's preferred price, any excess would flow back to Crow, since it had the right to acquire debtor's stock for a fixed price.

12. In addition, the Bankruptcy Court's finding of misconduct on appellants' part fortifies Stricklin's claim to standing. *Cf. In re Rea Holding Corp.*, 447 F.Supp. 167, 169 (S.D.N.Y. 1978) (unsuccessful bidder had no standing to appeal under "aggrieved person" test where there was no evidence of inequitable conduct).

The 'good faith' of a reorganization plan must be viewed in light of the totality of circumstances surrounding confection of the plan.... The bankruptcy judge is in the best position to assess the good faith of the parties' proposals.

*In re Jasik*, 727 F.2d at 1379, 1383 (5th Cir.1984) (quoting *Public Finance Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir.1983); *see also In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir.1984). To be sure, an important aspect of the good faith inquiry is a determination whether the proposed plan will rehabilitate the debtor and satisfy the claims against the estate. *Id.* at 425–26. Nonetheless, there is sufficient precedent for resting a finding of bad faith on nondisclosure or misrepresentation. *See American United Mutual Insurance Co. v. City of Avon Park*, 311 U.S. 138 (1940); *Barnes v. Whelan*, 689 F.2d 193 (D.C.Cir.1982); *In re Goeb*, 675 F.2d 1386, 1390 n. 9 (9th Cir.1982). In the instant case, debtor and Crow failed to disclose relevant information and thus misrepresented the nature of their agreement.[13]

Appellants' third argument—that whatever bad faith may have existed was vitiated by subsequent disclosure—presents a closer question. At the December 17, 1984 hearing, the Bankruptcy Court allowed appellants to amend their disclosure statement to include the information revealed during the hearing. Later that same day, the creditors voted in favor of debtor's plan. Because an important function of disclosure is to ensure that the creditors have the information needed to make an informed choice, *see Avon Park*, 311 U.S. at 144, and because the creditors here arguably were informed of the nature of the agreement between debtor and Crow before they voted for debtor's plan, it is arguable that the Bankruptcy Court could have properly confirmed the plan.[14]

However, the refusal to confirm the plan was not an abuse of discretion. Where, as here, the creditors will be paid regardless of which plan is confirmed, it is not surprising that they will vote for the plan that will most quickly satisfy their claims.[15] Nonetheless, appellants owed the Bankruptcy Court, as well as the creditors, a duty of candor.[16] *See Landscaping Services*, 39 B.R. at 590–91. Despite appellants' protestations to the contrary, there is ample evidence to suggest they breached that duty. As the Fifth Circuit made clear in *Jasik*, the Bankruptcy Court was in the best position to determine whether appellants' subsequent involuntary disclosure remedied their bad faith. *See supra* n. 14. After extensive hearings, the Bankruptcy Court found that appellants' bad faith had not been vitiated and that the proper course was to deny confirmation of the plan. Under the facts of this case, the Court concludes that this finding was not reversible error.[17] *Coughlin*, 27 B.R. at 635.

**13.** The Court is aware that this case does not involve a typical conflict of interest problem, since Thomasson's interests were identical to debtor's. This fact did not give appellants the right to ignore the applicable disclosure requirements.

**14.** Appellees argue that appellants' disclosure was far from complete. The Court agrees that appellants were less than candid, and this fact lends support to the Bankruptcy Court's conclusion that appellants' bad faith had not been vitiated.

**15.** The record indicates that New Shanty's preference for debtor's plan was based on the belief that a sale to Crow could be completed more quickly than a sale to Stricklin.

**16.** As the Supreme Court noted in *Avon Park*,

The fact that the vast majority of security holders may have approved a plan is not the test of whether that plan satisfies the statutory standard. The former is not a substitute for the latter. They are independent.

311 U.S. at 148.

**17.** In fact, a contrary holding might have encouraged future parties to withhold potentially damaging information from disclosure statements. Under the rule advocated by appellants, there would be relatively little risk in withholding information because even if a material omission or misrepresentation were discovered, the bankruptcy court would be constrained to allow an amendment to the disclosure statement and to confirm the plan if the creditors so desired. The better rule is to allow the bankruptcy court the flexibility to deal with such situations on a case by case basis. In cases

### The February 5, 1985 Order

On January 28, 1985, three days after the Bankruptcy Court denied confirmation of debtor's plan, debtor transferred the 210-acre tract to Thomasson, who in turn transferred the property to appellant Crow-Childress-Mobley # 8 ("CCM# 8"), a limited partnership affiliated with Crow. Having heard of the impending transfer, appellees filed a motion for an order in aid of the Bankruptcy Court's jurisdiction and made an oral request for an immediate hearing. The Bankruptcy Court, through its law clerk, requested that the parties maintain the status quo until a hearing on January 31, 1985.[18] Shortly thereafter, the Bankruptcy Court learned that debtor would not agree to maintain the status quo pending a hearing. Consequently, the Bankruptcy Court held an immediate hearing on the motion.

At that hearing, the Bankruptcy Court discovered the property had been transferred out of debtor's estate. Finding that the transfer was probably invalid because it violated the October 29, 1984 and January 25, 1985 orders, the Bankruptcy Court issued a temporary restraining order enjoining any further alienation of the property. After additional hearings, the Bankruptcy Court orally ruled that appellees were entitled to a preliminary injunction, which was entered on February 5, 1985. On February 8, 1985, the Bankruptcy Court supplemented its oral ruling with a written order setting forth its findings of fact and conclusions of law. In essence, the Bankruptcy Court held that the January 28,

1985 transfers represented a de facto enactment of the plan rejected by the order of January 25, 1985 and thus were invalid.[19]

■ At the outset, the Court must determine the proper standard of review. CCM # 8 argues that the challenged order involves a non-core proceeding and that therefore the Bankruptcy Court's factual findings are subject to de novo review. The Court concludes, however, that the February 5, 1985 order is within the ambit of 28 U.S.C. § 157; consequently, the clearly erroneous standard of review is applicable with respect to the relevant findings of fact. *Northern Pipeline*, 458 U.S. at 56 n. 5; Bankr.R. 8013.

Appellants' primary argument is that the January 28, 1985 transfers were authorized by a consent order entered on September 28, 1984, which reflected the settlement of a dispute between debtor and its major secured creditor, New Shanty. That dispute involved New Shanty's motion to lift the automatic stay established by 11 U.S.C. § 362. Under the consent order, in the event the 210-acre tract had not been sold by January 29, 1985,[20] debtor had the right to transfer the property to Thomasson. The consent order also provided that if all outstanding valorem taxes were not paid by January 28, 1985, the automatic stay would be lifted without further order from the Bankruptcy Court.

In granting appellees' motion for injunctive relief, the Bankruptcy Court held that the orders of October 29, 1984 and January 25, 1985 had superseded the consent order.

---

involving negligent conduct, an amendment to the disclosure statement would clearly suffice. In cases like the instant case, however, where there is substantial evidence of bad faith, the bankruptcy court should be allowed broad discretion to decide whether to deny confirmation. It is also worth noting that, contrary to appellants' suggestion, it was not incumbent upon the Bankruptcy Court to confirm the plan simply because it allowed the creditors to vote based upon the amended disclosure statement. As noted, the requirements are separate. Moreover, judicial economy dictated submitting the plan to a vote before reaching the good faith issue, since a negative vote would have rendered moot any questions of bad faith.

18. CCM # 8 and Crow maintain they were unaware of the Bankruptcy Court's desire to maintain the status quo. But it is undisputed that counsel for appellees informed debtor's counsel of the Bankruptcy Court's request.

19. Apparently, under debtor's plan, the property would have eventually been transferred to CCM # 8.

20. The January 29, 1985 deadline was a typographical error; the date should have been January 28, 1985.

It is well settled that a bankruptcy court has the power to vacate or modify its orders, as long as it is equitable to do so. *In re Texlon Corp.*, 596 F.2d 1092, 1101 (2d Cir.1979).

> A bankruptcy proceeding is one continuous, often long proceeding, within which many other controversies and proceedings occur.... There is practical utility in the application of a rule which permits the vacation or modification of bankruptcy orders where subsequent events presented during administration demonstrate the necessity therefor; and to do so would not be inequitable.

*Id.* (quoting 7 Moore, *Federal Practice*, ¶ 60.18 at 215). The rationale expressed in *Texlon* is of great force here, given the complicated history of this case.

 Appellants argue that they acted in reliance on the consent order and that therefore the transfers cannot be enjoined. The Court disagrees for two reasons. First, the Court concludes that the orders of October 29, 1984 and January 25, 1985 did in fact supersede the consent order. Second, because appellants had to know that the consent order was in direct conflict with the Bankruptcy Court's more recent orders, it cannot be said that they relied in good faith upon the consent order.[21] More important, the plain fact is that debtor refused the Bankruptcy Court's request to maintain the status quo pending a hearing. *See supra* n. 18. Thus, it must be presumed that debtor hoped to evade the Bankruptcy Court's jurisdiction by completing the deal before the consent order could be formally vacated. Such conduct cannot be tolerated. Accordingly, it would not have been inequitable to vacate the consent order even after the transfers occurred.

██ Appellants also contend that the Bankruptcy Court misapplied the four prerequisites for the issuance of an injunction, viz.: (1) that there is a substantial likelihood plaintiff will prevail on the merits; (2) that there is a substantial threat plaintiff will suffer irreparable harm absent an injunction; (3) that the potential harm to plaintiff must outweigh the potential harm an injunction may cause defendant; and (4) that the injunction will not disserve the public interest. *E.g., Harris Corp. v. Iranian Radio and Television*, 691 F.2d 1344 (11th Cir.1982).

The Court concludes that the four prerequisites were satisfied in the instant case. As discussed, the transfers were not authorized by the consent order; thus, appellants are likely to lose on the merits.

The substantial threat of irreparable injury factor involves a more vexing question, however. Appellants argue that there was no substantial threat appellees would be harmed in the absence of an injunction because Stricklin does not have an "opportunity" right to purchase the 210-acre tract. This argument is, of course, related to the standing argument advanced with respect to the appeals addressed above. As discussed, in light of the unusual facts of this case, the Bankruptcy Court did not err in holding that Stricklin was a "party in interest" and thus had standing to object to the confirmation of debtor's plan under 11 U.S.C. § 1128(b). Therefore, it is at least arguable that Stricklin has a right to have its plan considered.[22] Obviously, the January 28, 1985 transfers, if valid, would defeat that right.

Moreover, notwithstanding the issue of Stricklin's standing, it must be remembered that the preliminary injunction was entered to enable the Bankruptcy Court to maintain

---

**21.** Appellants correctly point out that the consent order was mentioned in several hearings and that it was never formally vacated. Nonetheless, appellants had to know that subsequent events at the very least cast substantial doubt on the validity of the consent order. Thus, the prudent course would have been to clarify the Bankruptcy Court's previous orders before completing the transfers. The failure to do so can only be viewed with skepticism.

**22.** This conclusion does not mean that the Bankruptcy Court is precluded from dismissing the case, but rather that, if the case continues, the Stricklin plan should be considered. As developed below, however, the Court doubts that the Bankruptcy Court should continue exercising its jurisdiction over this case.

jurisdiction over debtor's property. In the Court's view, the Bankruptcy Court had a cognizable interest in preventing the transfer, since it had assumed jurisdiction over the property. *See Landscaping Services,* 39 B.R. at 590–91 (bankruptcy court has a duty to maintain its integrity). Similarly, the public interest was served by the injunction because a transfer of land completed under these circumstances would damage the integrity of the Bankruptcy Court. Finally, the Bankruptcy Court correctly held that the injunction caused no harm to appellants, since CCM# 8 can formulate development plans despite the preliminary injunction.

■■■ Appellants also contest the Bankruptcy Court's authority to enter an injunction in the absence of an adversary proceeding and the related procedural safeguards. It is undisputed, however, that the preliminary injunction was closely related to an adversary proceeding commenced by appellees on January 31, 1985. It is also undisputed that appellants were accorded notice and an opportunity to be heard. In the absence of prejudice, the procedural irregularities alleged are not grounds for reversal. *In re Macon Uplands Venture,* 624 F.2d 26, 28 (5th Cir. 1980) (per curiam). In addition, 11 U.S.C. § 105(a) gives bankruptcy courts the power to "issue any order ... necessary or appropriate to carry out the provisions of this title." This power necessarily entails the authority to enter injunctions in aid of jurisdiction where a party improperly attempts to transfer property out of the debtor's estate. *Cf. id.* (district courts have authority to enter injunctions in aid of jurisdiction under the All Writs Act, 28 U.S.C. § 1651).

Accordingly, the Court will affirm the Bankruptcy Court's order of February 5, 1985.

*Conclusion*

For the reasons stated above, the Court will not disturb the orders challenged in these consolidated appeals. Nevertheless, the Bankruptcy Court would be well advised to dismiss this case. *See In re Albany Partners, Ltd.,* 749 F.2d 670, 673–74 (11th Cir.1984) (Chapter 11 petition may be dismissed under 11 U.S.C. § 1112(b) on grounds that petition was filed in bad faith); *see also* 11 U.S.C. § 305(a). To be frank, debtor neither needs nor deserves the protection of the Bankruptcy Court. Moreover, the underlying imbroglio does not concern the protection of creditors or the rehabilitation of debtor. Therefore, this case implicates few, if any, of the policies underlying bankruptcy law and represents an unwarranted abuse of judicial resources. Simply stated, this case is nothing more than a bidding war, and, as such, it is best resolved in the open market.[23]

In sum, the Court DISMISSES the appeal of the Bankruptcy Court's order of October 29, 1984 and DENIES Crow's motion for leave to appeal. The Court AFFIRMS the Bankruptcy Court's orders of January 28, 1985 and February 5, 1985. The parties have also submitted several motions to supplement the record and file additional briefs. These motions are GRANTED.

---

23. The record reveals that the Bankruptcy Court has previously considered and rejected the course suggested here. Although the court wholeheartedly endorses the Bankruptcy Court's efforts to maintain its integrity and prevent an abuse of its resources, the proceedings to date sufficiently realize these goals. In addition, the goal of deterrence has been served: certainly, a party who reviewed the history of this case would decide to err on the side of disclosure in submitting a reorganization plan.

The Bankruptcy Court has acted properly in refusing to place its imprimatur on debtor's plan and preventing appellants from evading its jurisdiction. But this does not mean that the Bankruptcy Court is duty bound to prevent the Crow entities from ever acquiring debtor's property. As things now stand, this case threatens to drag on for years. This would, in the Court's view, constitute an abuse of judicial resources every bit as real as that perpetrated by debtor.