**In re TRANSAMERICA BUSINESS CORPORATION, Debtor.**

**Bankruptcy No. 85–01489–BKC–TCB.**

United States Bankruptcy Court, S.D. Florida.

March 1, 1988.

Samuel L. Heller, Ft. Lauderdale, Fla., for debtor.

## ORDER DENYING CONFIRMATION AND SETTING HEARING TO CONSIDER CONVERSION TO CHAPTER 7 OR DISMISSAL

THOMAS C. BRITTON, Chief Judge.

A confirmation hearing was held December 2, 1986 in this chapter 11 case filed July 5, 1985, two and a half years ago.

The following day, an order was entered reserving ruling on confirmation for three weeks, pending the debtor's filing certificates that the plan had been accepted by the creditors and that counsel held in his trust account sufficient funds to make the first distribution required by the debtor's plan. (CP 145). The debtor has yet to file either certificate.

I now find that the plan before me, the debtor's second [1], has not been proposed in good faith and, for the reasons stated below, leave is denied to file another plan or a further modification of this plan.

A hearing, on notice to all counsel who have appeared in this case, will be held at 10:00 a.m. on March 22, 1988 in room 326 at 701 Clematis Street, West Palm Beach, Florida, to determine whether this case will be converted to chapter 7 or dismissed.

The debtor's motion (CP 185a) for reconsideration of the Order Extending Deadline For Debtor's Compliance With Requirements For Confirmation of August 17, 1987 (CP 183) is also denied.

### The Debtor's History

The debtor is a Florida corporate land developer formed 37 years ago. Twelve years ago H.J. Mellon became the president and chief executive. All or virtually all the stock was owned by Mellon and his wife. Mellon died in March 1985, five months before this bankruptcy. His daughter, A.M. Renc, succeeded her father, and Mrs. Mellon has been retained as an administrative assistant. They continue to control this debtor.

The bankruptcy was precipitated by the closing of all the debtor's accounts by its banker, Barnett. However, the failure of the debtor resulted from three other circumstances.

The debtor sold subdivided lots in six Florida counties on ten-year agreements for deeds, half of which had been sold in Central and South America at prices quoted in foreign currency. In 1985, rapid inflation throughout most of that area drastically reduced the value of the debtor's accounts receivable and its cash flow below survival levels. The debtor's properties were heavily mortgaged and it had expensive commitments to complete land im-

---

1. A confirmation hearing was held July 8, 1986 on the debtor's first plan, which had been filed March 18. Confirmation was denied on July 10 and, on the debtor's motion, leave was granted to file an amended plan by August 8, 1986. (CP 110). The present plan, as subsequently modified (CP 131a), was filed that day.

provements required for the subdivisions it was marketing.

The debtor's sales force was poorly supervised and diverted receipts, took kickbacks, and generally defrauded both the debtor and the debtor's vendees. This not only reduced the cash flow, but also resulted in a number of lawsuits filed against the debtor, all of which have been stayed by this bankruptcy and remain pending and contributed to the debtor's default with regulatory agencies.

The primary regulatory control of this developer is the Florida Department of Business Regulation's Division of Land Sales, which requires a developer to deposit varying percentages of its vendees' payments in trust accounts for the payment of the required roads, drainage and other commitments required of and made by the developer. The debtor's defaults led to suspension of its authority to continue retail sales.

The debtor has ceased all business before it came in this court, and in the plan presently before me, it has abandoned any hope of ever resuming any activity.

The foregoing summary of the debtor's history comes solely from the debtor. (CP 123). If it errs, therefore, it does not err as to the causes or extent of the debtor's past shortcomings.

The debtor's current chief executive, Ms. Renc, left college without a degree, has had experience as an accountant and a stockbroker and presently owns and operates a Lake Worth landscaping business.

### The Debtor's Assets, Liabilities and Cash Flow

The debtor's acknowledged liabilities total $1.2 million, roughly half owed to mortgagees and half to unsecured creditors. Its assets are its outstanding agreements for deed and six subdivisions, three of which are in Volusia County and one in each of three other counties.[2]

The agreements for deed have a face value of $3 million. The debtor values these contracts at $225,000 on the assumption that someone else will complete the subdivisions it cannot complete. Their value is, therefore, highly speculative.

The subdivisions are so heavily mortgaged that the debtor has yet to find an immediate cash purchaser of its claimed equity in a single one. The debtor initially valued these properties at $15 million, but now values its total equity in the six subdivisions at $1.4 million. This estimate is based upon speculative assumptions. The debtor is, in fact, insolvent.

In the six months immediately preceding the filing of its Amended Disclosure Statement on September 5, 1986, the debtor had received income of $93,725 and had spent $94,255. The expenditures included a weekly salary of $800 for Mellon's daughter and $150 a month for Mellon's widow. The most recent debtor's report (DIP # 67) shows total receipts since bankruptcy of $156,461 and total expenses of $159,758, leaving a net balance on hand of $1,269, which is $3,296 less than this debtor had when it filed for bankruptcy.

The debtor's only significant income ($1,478 for the first two weeks of this past month) is from agreements for deed. I doubt that any of these vendees can ever receive clear and unencumbered title to the property they are paying for.

This debtor has filed no federal tax return since 1981 and has paid no property taxes since at least a year or two before bankruptcy.

### The "Amended" Amended Plan

The debtor's Amended Plan (CP 113), filed August 8, 1986, was "supplemented" November 3, 1986 (CP 131a). This is the plan for which the debtor seeks confirmation.

In its present version it proposes a straight and complete liquidation and distribution, indistinguishable from a chapter 7

2. The debtor also owns small groups of lots in three counties, whose values have been included in the discussion of the six subdivisions.

liquidation except that this debtor rather than an independent trustee under the supervision of the U.S. Trustee would complete the liquidation and distribution.

Specifically, it proposes the bulk sale of each of the six subdivisions by auction during January 1987. However, a month past that deadline, it has conducted no auction and has *conditionally* sold only one subdivision, Poinciana in Martin County. That sale is to Marlin, the attorney for a realtor, Giovannetti, who will receive a 10% commission if the sale ever closes. The sale price is $448,500, 60% of which is to be financed for five years. I authorized the sale March 13, 1987, almost a year ago. No closing has yet been scheduled.

Martin's commitment is conditioned upon his getting complete clearance from all federal, state, county and local regulatory agencies. Immediately, to meet those requirements, he must get $750,000 worth of road construction from Martin County through a bond issue secured by assessments to be levied against the adjoining property owners.

To get this funding, the debtor proposes to borrow $60,000 from the Division of Florida Land Sales from which it will pay $17,500 to an attorney and $15,000 to an engineer, who will be hired to persuade the County Commission to borrow the $750,000 to build the roads.

This is the sum total result of this debtor's efforts on behalf of its creditors after two and a half years' of bankruptcy.

### The Debtor's Motion for Rehearing

The debtor's obvious inability to meet the requirements imposed on it at the confirmation hearing 14 months ago (CP 145), led to three extensions (CP 153, 163, 183) which in each instance postponed the deadline to the date requested by the debtor. The third extension expired September 27, 1987. The debtor then moved (CP 185a, 186a) for reconsideration of that deadline, asking an additional four months to January 14, 1988.

However, at a status conference held February 9, 1988 the debtor estimated it would take six months to get the County Commission's vote and, of course, additional time to get the $750,000, the roads built, the regulatory approval, and the closing of the first conditional subdivision liquidation.

The plan before me, as most recently revised, categorically promised liquidation by auction of all five subdivisions by February 1, 1988 and final distribution by February 8. For that reason, I have declined to grant a fourth extension and now deny the debtor's motion.

### Findings and Conclusions

It is an essential requirement for confirmation that I find that the plan before me has been proposed in good faith. 11 U.S.C. § 1129(a)(3). I cannot make that finding here.[3] I am unable to believe any commitment or representation made by this debtor's principal or her attorney.

The events summarized above are merely highlights of a consistent trail of broken promises and commitments. See, for example, the accurate list presented by one creditor's attorney five months ago (CP 190 pp. 4–6).

This case has survived this long only because as each broken commitment has been replaced by a new one, this debtor has either surrendered assets to disillusioned secured creditors or made new concessions and promises to every vocal objector. The

---

**3.** In the recent words of District Judge Shoob of this Circuit, quoting from the Fifth Circuit:

"The 'good faith' of a reorganization plan must be viewed in light of the totality of circumstances surrounding confection of the plan." *Big Shanty Land Corp. v. Comer Properties, Inc.,* 61 B.R. 272, 281 (N.D.Ga.1985). See to the same effect *In re Madison Hotel Associates,* 749 F.2d 410, 425 (7th Cir.1984); In *In re Hoosier Hi–Reach, Inc.,* 64 B.R. 34, 38 (Bankr.S.D.Ind.1986), bad faith was found from the debtor's delay of six months in collecting receivables and a year to conclude a lawsuit; In *In re Distrigas Corp.,* 66 B.R. 382, 389 (Bankr.D.Mass.1986) confirmation was denied based on the debtor's failure after six months to present "anything more than an illusory plan"; In *In re Economy Cast Stone Co.,* 16 B.R. 647, 650, (Bankr.E.D.Va.1981), bad faith was found from continued operation at a loss with funds which should have been segregated.

debtor has then represented to me that every affected party supports its request that it be given just one more chance.

If the debtor could survive without the shield of the automatic stay, § 362(a), this debtor would never have filed nor would it remain in bankruptcy. There must be a number of creditors severely prejudiced by the protracted pendency of this case, who cannot afford representation or do not understand what is happening or, very possibly, have not even been scheduled as creditors.

Such creditors include the purchasers of tax certificates, who have been prevented from enforcing their statutory rights through tax sales. The debtor estimated its property tax delinquency owed in six counties a year and a half ago to total $69,900. (CP 123).

Such creditors also include the people who think they are buying or have bought lots from this debtor. The recent letter of January 25, 1988 from one purchaser in Panama to the Clerk of this court says in part:

"After two years or so; I have been trying to get a reply from Mrs. Arlene Mellon of the Trans American Business Corp.; and just found out; that this Corp. is been on a Bankcruptcy case and your goodselve is the State Administrator.

"I have tried without luck to get my titles or deeds for two lots; and to pay the Land taxes; can you inform me to whom should I pay the taxes? (CP 200).

If this debtor is really acting in the best interests of *all* of its creditors, a dismissal would not prevent it from continuing what it has done here for the past two and a half years *and* a dismissal would save a lot of potential attorney fees.

If this case is to remain in bankruptcy for final liquidation, this debtor's principal and her attorney have completely forfeited my confidence in their ability to protect the creditors' interests as effectively as a disinterested chapter 7 panel trustee.

It is obvious to me that this case must either be dismissed or converted. Before making the choice, I would like to have what help the counsel that have appeared in this case can give me.[4] The hearing scheduled above is, of course, for that purpose.

---

**4.** This court was only recently brought within the U.S. Trustee program and this case is not yet within his jurisdiction.